777 So.2d 399 (2000)
Lynford R. BLACKWOOD, Appellant,
v.
STATE of Florida, Appellee.
No. SC90859.
Supreme Court of Florida.
December 21, 2000.
*402 Richard L. Jorandby, Public Defender, and Gary Caldwell, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Marrett W. Hanna, Assistant Attorney *403 General, West Palm Beach, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon appellant Lynford R. Blackwood. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm Blackwood's conviction for first-degree murder and his sentence of death.

MATERIAL FACTS
Appellant was arrested in St. Petersburg, Florida, for the 1995 murder of Caroline Thomas Tynes. At trial it was established that appellant and the victim had dated on and off for approximately ten years but the relationship had ended sometime in October 1994; the victim had started dating someone else and, in fact, was six weeks pregnant at the time of her death. Upon his arrest, appellant confessed to choking the victim, but maintained that he did not intend to kill her. According to appellant, he had driven in his brother's truck to the victim's house on the morning of January 6, 1995, to return a set of sheets. After the two talked for a while, appellant and the victim engaged in consensual sexual intercourse. Afterwards, while lying in bed, they started to argue. Appellant claimed the victim told him that she did not want to see him anymore. He also claimed that the victim had told him that she had aborted six of his children. Appellant admitted to the police that he then strangled the victim using one or both of his hands.
Afterward, he left the victim's house and drove away in her car, leaving his brother's truck behind. He later abandoned the victim's car and hitchhiked to St. Petersburg, where he eventually was arrested. Prior to his arrest, appellant admitted to his cousin-in-law, Donovan Robinson, that he had choked the victim after arguing with her. Robinson testified that appellant appeared surprised when he learned the victim was dead. Appellant claims that he did not intend to kill the victim and that she was still breathing when he left. In addition, he maintained that he loved the victim and that he would have done anything he could to stay with her. According to one of the officers who took appellant's statement, appellant was upset and crying during his statements to the police.
The victim had been discovered on the evening of January 6, lying naked in the bedroom of her home in Fort Lauderdale. The cause of death was asphyxia. During the crime-scene investigation, one of the officers noticed that the house was meticulously kept but observed that objects on the table beside the bed had been tipped over or knocked to the floor. In the officer's opinion, the displaced items indicated signs of a struggle. The police also noted a box of condoms next to the bed and a condom wrapper on the floor in the hallway outside of the bedroom. There were no signs of forced sex. A lock of the victim's hair was found on the mattress and a folded washcloth and bar of soap had been lodged in the back of the victim's mouth blocking her pharynx. White foamy substance in her mouth and nose was later determined to be a combination of lung fluid and soap lather. According to the medical examiner, the fact that the foamy substance was also discovered in the victim's nose indicates the victim was alive when the soap and washcloth were placed in her mouth because she would have been forced to breath through her nose due to occlusion of her pharynx. The medical examiner also testified that indentations and foamy substance on one of the pillows next to the victim suggests that the pillow was placed over the victim's face to stop her from breathing. The defense attempted to rebut this conclusion on cross-examination, wherein the medical examiner admitted that she was unaware that EMS personnel had inadvertently touched the foamy substance with his hand as he was checking the victim for vital signs and that *404 he wiped his hand on one of the pillows on the bed. Based on this line of questioning, the defense created the possibility that the indentation and foam on the pillow was caused by the EMS personnel, and was not, as the medical examiner had initially surmised, caused by appellant placing the pillow over the victim's mouth. The defense's theory with regard to the pillow is also supported by appellant's confession to the police wherein he admitted to strangling and possibly placing the soap in the victim's mouth but denied moving or placing a pillow on her face.
The victim also had markings on her neck and bruises on the neck muscle indicating both ligature and manual strangulation. The medical examiner testified that the markings on the victim's neck were consistent with a double-stranded speaker wire found on the floor of the victim's bedroom. Small scratches on the victim's neck indicated the victim had tried to remove whatever was binding her neck. The medical examiner also noted petechia hemorrhaging in the whites of the victim's eyes, which she explained is caused by pressure around the victim's neck being released and reapplied. The number of hemorrhages detected suggests that the victim was alive and struggling while being strangled and that it took a while for death to occur. In other words, according to the medical examiner, petechia hemorrhaging does not occur in persons who die suddenly from asphyxia. Rather, it would have taken minutes, as opposed to seconds, for death to occur. Although the medical examiner could not determine the order in which the acts occurred, she opined that death could have resulted from any one of the above methods (i.e., manual or ligature strangulation, soap and washcloth in victim's mouth, and suffocation by the pillow).
The defense rested without presenting any additional evidence. The jury found the defendant guilty of first-degree premeditated murder.
During the penalty phase of the trial, the State presented two witnesses: the medical examiner and the victim's mother, Bernice Scott. The medical examiner repeated much of the same testimony presented during the guilt phase of the trial, but added that based on the manner of death, the victim would have probably been aware of her impending death. Ms. Scott testified about the effect her daughter's death had on the community and on her daughter's family, including herself.
The defense presented numerous witnesses during the penalty phase, including appellant's friends and family members. Collectively, they testified that appellant was a slow learner,[1] that he was not a violent person and had never been violent or abusive toward the victim, that appellant was depressed and upset about breaking up with Caroline, that he worked for fifteen years as a cabinet maker, that he had a good relationship with his son, and that he did not smoke, drink, or consume drugs. A detention officer from the Broward County Jail testified that appellant behaves well in prison and as a result has been placed on trustee status, which means he is given limited responsibilities. The officer also indicated that Blackwood had been placed on suicide watch while in prison after attempting to commit suicide. Following the close of evidence and summations by the lawyers, the jury recommended death by a vote of nine to three.
At the Spencer[2] hearing, the defense presented Dr. Trudi Block Garfield, the clinical psychologist who had interviewed appellant three times over the course of two years. Dr. Garfield testified that appellant was extremely depressed at the time of her evaluation. She also testified that appellant has a verbal IQ score of 70 which places him in a borderline-retarded range of intelligence. However, Dr. Garfield *405 could not say with certainty that appellant is retarded because she did not run all of the appropriate tests and because she attributed his score to the depression. Additionally, Dr. Garfield noted that one of the standardized tests suggested that appellant is neurologically impaired, but she could not find any physical indications to suggest he was in fact impaired.
As for mitigators, Dr. Garfield concluded that appellant was emotionally disturbed at the time of the offense, but denied that appellant's mental state was "extreme." Additionally, Dr. Garfield testified that appellant had no prior criminal activity, that he had a difficult upbringing in that he was abandoned by his mother and raised by his grandmother and other relatives, often with insufficient food, that he expressed regret for his actions, that he had good work habits, that he drank a lot of alcohol the night before the murder (based on appellant's admission to her), and that he is a good candidate for rehabilitation because of the small likelihood that he would repeat such a crime. This last conclusion was based on Dr. Garfield's finding that appellant had never been in trouble before and that the murder in this case appears to have arisen from an emotional personal altercation between two people with a long-term relationship.
In rebuttal, the State presented testimony from an official from the Broward County Sheriff's Office that appellant had been disciplined for having contraband in his cell (a pen, two extra pairs of shoes, and an extra pillow), for writing on the cell walls, and for getting into a fight with another inmate. The witness also stated that appellant had refused to come to court on a couple of occasions, that he did not get along with the other inmates, and that he had threatened another inmate on one occasion. Finally, the official testified that Blackwood had never achieved trustee status as that term is defined by the Broward County Sheriff's Office.
Following arguments and memoranda by the parties, the trial court sentenced appellant to death. In doing so, the trial court found one aggravating factor: the murder was heinous, atrocious, or cruel (HAC). See § 921.141(5)(h), Fla.Stat. (1995). The trial court denied the State's request to find the murder was cold, calculated and premeditated (CCP). The court found that the CCP aggravator was not proven beyond a reasonable doubt and therefore the court did not instruct the jury on this aggravator or consider it in rendering sentence. The trial court found one statutory mitigator (no significant history of prior criminal conduct), which it gave "significant weight", and eight nonstatutory mitigators: (1) emotional disturbance at the time of the crime (moderate weight); (2) capacity for rehabilitation (very little weight); (3) cooperation with police (moderate weight); (4) murder resulted from lover's quarrel (no specific weight given but considered this factor to the extent that the killing was borne out of a prior relationship and was fueled by passion); (5) remorse (some weight), (6) appellant is good parent (some weight); (7) appellant's employment record (some weight); and (8) appellant's low intelligence level (some weight).[3]

APPEAL
Appellant raises nine issues for our review.[4] We turn first to appellant's claims concerning the guilt phase of the trial.

*406 Premeditation

Appellant argues that the trial court erred in denying his motion for judgment of acquittal because the State's evidence does not contradict appellant's contention that he did not intend to kill Caroline and that he believed she was still alive when he left her house. He maintains that although the strangulation and use of a speaker wire, washcloth and soap suggests a purposeful action, there is no evidence that he acted under a fully formed, premeditated design to kill.
Premeditation is defined as "a fully-formed conscious purpose to kill, which exists in the mind of the perpetrator for a sufficient length of time to permit of reflection, and in pursuance of which an act of killing ensues." Sireci v. State, 399 So.2d 964, 967 (Fla.1981). Premeditation may "be formed in a moment and need only exist `for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act.'" DeAngelo v. State, 616 So.2d 440, 441 (Fla.1993) (quoting Asay v. State, 580 So.2d 610, 612 (Fla. 1991)). Premeditation can be established by circumstantial evidence. See Sireci, 399 So.2d at 967. As this Court has stated:
Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.
Sochor v. State, 619 So.2d 285, 288 (Fla. 1993) (quoting Larry v. State, 104 So.2d 352, 354 (Fla.1958)). Where, as here, the State seeks to establish premeditation by circumstantial evidence, the evidence relied upon must be inconsistent with every other reasonable inference. See Wilson v. State, 493 So.2d 1019, 1022 (Fla.1986). If the State's proof fails to exclude a reasonable hypothesis that the murder occurred other than by premeditated design, a verdict of first-degree murder cannot be sustained. See Fisher v. State, 715 So.2d 950, 952 (Fla.1998); Kirkland v. State, 684 So.2d 732, 734 (Fla.1996); Hoefert v. State, 617 So.2d 1046 (Fla.1993).
In Holton v. State, 573 So.2d 284 (Fla. 1990), a case involving circumstantial evidence, this Court held that the evidence was sufficient to support the jury verdict for premeditated murder. The victim had been found with a ligature securely tied around her neck and her house had been burned, presumably to conceal the crime. The medical examiner determined that death was caused by strangulation. Scratch marks on the defendant's chest indicated the victim had struggled during the attack. Although the defendant had claimed that he did not intend to kill the victim and that the murder was an accident, we concluded that based on the State's evidence to the contrary, the jury chose not to believe the defendant's version of events. See id. at 289-90.
We find the evidence of premeditation in this case sufficient to support the jury's verdict. The circumstances of the crime, including the physical evidence, the nature of the victim's injuries, and the manner of death, provide a sufficient basis for a jury to conclude that appellant acted with a purpose to inflict death. That there was no evidence that appellant had formed a criminal intent in the days or weeks prior to the murder does not preclude the conclusion that the appellant formed the necessary intent while inside the victim's house on the day of and at the time of the murder. Thus, we find that the manner of death in this case belies appellant's argument that he did not intend to kill the *407 victim; the jury obviously believed the State's evidence rather than the defense's theory that death was unintended. See Wilson; see also DeAngelo, 616 So.2d at 442 (rejecting appellant's contention that he strangled victim in blind rage during an argument where evidence indicated victim was choked manually and with ligature and appellant would have had to choke victim five to ten minutes to kill her). Accordingly, we find no error in the trial court's denial of appellant's motion for judgment of acquittal.

Admission of Hearsay Testimony
Next, appellant contends the trial court improperly admitted hearsay testimony by the victim's daughter and sister. The record reveals that following the defense objections and a proffer of the proposed testimony, the victim's daughter, Serina Thomas, was permitted to testify that two days before the murder appellant had told her that the victim "had abortions from him, and that now she was pregnant from someone else." The witness also testified that appellant had told her that he had offered to share the victim with the other man, and that the victim had told him that she did not want him at all. Additionally, the witness testified that appellant told her that he was getting ready to leave for Jamaica "because he couldn't handle it anymore, and he was leaving after his son's birthday." In essence, appellant contests the admission of (1) statements allegedly by the victim to the appellant sometime before the day of the murder and (2) statements by the appellant that he planned to leave for Jamaica in a few weeks.
Under Florida's Evidence Code, the victim's statements to the appellant would be hearsay if offered for the truth of the matter asserted and none of the exceptions to the hearsay rule apply. See §§ 90.801.803, Fla.Stat. (1995). The State argues that the victim's statements to the appellant were not offered to prove the truth of the matter asserted. Rather, the State contends the statements were relevant to prove appellant's intent and the effect the statements had on him.
We agree with the State that the witness's statements relaying the victim's comments to appellant were not hearsay. See Taylor v. State, 601 So.2d 1304, 1305 (Fla. 4th DCA 1992) (holding that statement by victim's father to defendant offered to prove defendant's state of mind or knowledge of a particular fact was not hearsay and should have been admitted); Johnson v. State, 388 So.2d 1088, 1089 (Fla. 3d DCA 1980) (holding that testimony of out-of-court statement to defendant, offered only to show its effect upon defendant's state of mind, was not hearsay and should have been admitted). Based on the context of the witness's testimony, the victim's statements were not used to prove that, in fact, she was pregnant (a fact which is undisputed), or had had abortions, or did not want to see appellant anymore. Instead, the victim's statements were offered to show the effect such statements had on appellant. His state of mind and knowledge were relevant to show both his motive and intent in committing murder. Certainly, the appellant's knowledge of the victim's past abortions, pregnancy, and intention not to see him anymore were material to the issue whether appellant possessed a motive to kill the victim. Thus, we find no error in the trial court's admission of statements as to what the victim allegedly told the appellant.
Appellant raises a similar argument with respect to testimony by the victim's sister, Hazel Scott. She testified that the appellant told her around Christmas time that the victim had left him, that she was pregnant with someone else's child, that she was dating someone else, and that he was going to return to Jamaica because there was nothing left for him here. Defense counsel did not object to these statements. Thus, any error with regard to the statements admitted through the testimony of Ms. Scott have not been preserved for review. See San Martin v. *408 State, 717 So.2d 462, 470 (Fla.1998) (stating that admissibility of testimony of witness who relayed statements by victim was not preserved for appellate review where defendant failed to object). Even if the claim was preserved, there does not appear to be any hearsay problem because Ms. Scott never mentioned any statements by the victim. Her testimony was limited to what the appellant told her and not what the victim allegedly told him. Under Florida's Evidence Code, the appellant's own statements are admissible as an admission by a party opponent. See § 90.803(18), Fla.Stat. (1995); Delacruz v. State, 734 So.2d 1116, 1122 (Fla. 1st DCA 1999) (holding statement by defendant at time of arrest was properly admitted as admission by party opponent pursuant to section 90.803(18)).
As for the statements by appellant concerning his intent to go to Jamaica, however, we agree with appellant that, considering the circumstances surrounding the statement, the statement was not relevant to a material issue in the case. While appellant's statements may be admissible as an admission by a party opponent under section 90.803(18), such statements may only be admitted if relevant to prove a material fact in issue. See Hoefert, 517 So.2d at 1050 (noting that "like all evidence, the [defendant's] statements will only be admitted if relevant to prove a material fact in issue"). Contrary to the State's assertion, appellant's announced intent to go to Jamaica following his son's birthday was not demonstrated to be relevant to whether he intended to kill the victim and, therefore, should not have been admitted. However, we find the error in allowing the statement to be harmless. The statements about returning to Jamaica were made in the context of relaying his sadness over his breakup with the victim and his corresponding belief that he had no reason to remain in the United States. Furthermore, during closing arguments to the jury, the State did not mention the fact that appellant planned to return to Jamaica or suggest that he planned to kill the victim and then flee to Jamaica. Thus, to the extent the court erred in allowing statements of the appellant's intent to return to Jamaica, the error appears to be harmless because there is no possibility that it contributed to the outcome of the proceedings. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
Based upon our review of the record, we find the evidence and testimony in this case sufficient to support appellant's conviction of first-degree murder. Accordingly, we now turn to the penalty phase of the trial and appellant's issues in relation to that phase.

Penalty Phase
Appellant raises a number of challenges pertaining to the penalty portion of the trial. He argues the trial court committed error in excluding certain evidence, in finding the murder was heinous, atrocious or cruel ("HAC"), and in rejecting or failing to consider other statutory mitigating circumstances. Appellant also contends that his sentence of death is disproportionate compared to other capital cases in which we reversed the sentence of death and imposed a sentence of life imprisonment.

HAC
In State v. Dixon, 283 So.2d 1 (Fla.1973), this Court provided the following definition for the HAC aggravator:
It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
*409 Id. at 9. In considering challenges to the HAC aggravator, this Court has stated numerous times that "`it is permissible to infer that strangulation, when perpetrated upon a conscious victim, involves the foreknowledge of death, extreme anxiety and fear, and that this method of killing is one to which the factor of heinousness is applicable.'" DeAngelo, 616 So.2d at 442 (quoting Tompkins v. State, 502 So.2d 415, 421 (Fla.1986)); see also Orme v. State, 677 So.2d 258, 263 (Fla.1996) ("Our case law establishes, however, that strangulation creates a prima facie case for this aggravating factor; and the defendant's mental state then figures into the equation solely as a mitigating factor that may or may not outweigh the total case for aggravation."); Sochor, 619 So.2d at 292; Holton, 573 So.2d at 292.
First, appellant argues there is no evidence that he intended to torture the victim. He also argues that the victim was rendered unconscious, which precludes a finding of heinous, atrocious or cruel. We agree that the evidence in this case supports the trial court's finding that the murder was HAC. The injuries to the victim's eyes and neck indicate that she was conscious while being attacked and had struggled to stay alive. Thus, she was conscious long enough to be aware of what was happening to her and to fear her impending death. Under the circumstances presented herein, and the case law described above, we find no error in the trial court's finding of HAC.

Mitigating Circumstances
Appellant contends the trial court erred by rejecting or failing to find certain statutory mitigators. He first argues that the trial court erred in rejecting the statutory mitigator that appellant was under an extreme mental or emotional disturbance at the time of the crime. Appellant contends the trial court incorrectly relied on the defense expert's conclusion that appellant's mental state did not rise to the level of "extreme."[5]
Whether a mitigator has been established and the appropriate weight to be given to that mitigator are matters within the discretion of the trial judge based upon the evidence presented. See Bonifay v. State, 680 So.2d 413, 416 (Fla. 1996); Campbell v. State, 571 So.2d 415, 420 (Fla.1990). The trial court's finding is not subject to reversal merely because the appellant reaches a different conclusion. See James v. State, 695 So.2d 1229, 1237 (Fla.1997).
Here, Dr. Garfield testified that appellant was extremely depressed at the time of her evaluations and that he had been on suicide watch while in prison for the murder charge. Based on the expert's evaluations of appellant, she concluded that he suffered from a mental disturbance. However, she admitted that she could not characterize appellant's mental state as "extreme" under the statutory mitigating circumstance. Based on this testimony, and the lack of any other evidence indicating the severity of appellant's mental state, the trial court rejected the *410 statutory mental mitigator. However, the trial court apparently considered the expert's testimony that appellant was depressed and suffering from a mental disturbance because it found such evidence sufficient to establish a nonstatutory mitigator. Indeed, the trial court gave this evidence "moderate" weight. Thus, evidence of appellant's mental state at the time of the crime was found and considered by the trial judge in weighing the aggravating and mitigating circumstances. Accordingly, we find no abuse of discretion in the trial court's rejection of the statutory mental mitigator in this case.
Appellant also argues that the trial court failed to consider his age (37) at the time of the offense as a statutory mitigating factor. In Dixon, we stated that the age mitigator "allows the judge and jury to consider the effect that the inexperience of the defendant on the one hand or, in conjunction with subsection (a) [no significant criminal history], the length of time that the defendant has obeyed the laws in determining whether or not one explosion of criminality warrants the extinction of life." 283 So.2d at 10. In light of this interpretation, we approved the finding of the age mitigator in Burns v. State, 699 So.2d 646 (Fla.1997), in relation to a forty-two year old defendant. The trial court there had found that both the defendant's age and the fact that he had no significant history of prior criminal activity supported separate statutory mitigating factors. With regard to the age mitigator, we stated that "[a]ge at the time of the offense is a [statutory] mitigating factor in this case to the extent that it demonstrates, in conjunction with Burns' lack of a history of prior criminal activity, the length of time Burns obeyed the law prior to committing this crime." Id. at 648 n. 4 (citing Dixon, 283 So.2d at 10). Thus, the age of the defendant, "whether youthful, middle-aged, or aged," is a relevant factor to consider in determining whether to mitigate the defendant's punishment. Dixon, 283 So.2d at 10.
Here, the record on appeal reflects that appellant was thirty-seven at the time of the killing[6] and that at that time he had no history of prior criminal activity. Thus, the evidence may support the statutory age mitigator as broadly discussed in Dixon. However, the record shows that defense counsel did not request a jury instruction on age as a mitigating factor, did not argue to the jury that age was a mitigating factor, and did not urge the judge to consider the appellant's age as a statutory mitigating factor.
Nevertheless, even if the trial court erred in not considering the appellant's age in mitigation, we find the error to be harmless. The jury was instructed that it could consider the fact that appellant had no significant history of prior criminal activity. Further, the trial court considered appellant's lack of criminal history and gave significant weight to that fact in its sentencing order. Cf. Burns. Had the jury been instructed or the trial court considered the appellant's age based on the same reason (lack of criminal activity), it does not appear beyond a reasonable doubt that the jury's recommendation or the trial court's determination that death was the appropriate penalty would have been any different. See DiGuilio.

Exclusion of Mental Health Reports
Appellant argues that the trial court erred in refusing to admit three reports by defense expert Dr. Garfield on the basis that such reports were cumulative and hearsay. The reports at issue were never made a part of the record in this case, nor were the contents ever proffered to the court. In order to preserve a claim based on the court's refusal to admit evidence, the party seeking to admit the evidence must proffer the contents of the excluded evidence to the trial court. See Lucas v. State, 568 So.2d 18, 22 (Fla.1990) *411 ("A proffer is necessary to preserve a claim such as this because an appellate court will not otherwise speculate about the admissibility of such evidence."); Jacobs v. Wainwright, 450 So.2d 200, 201 (Fla.1984) ("The purpose of a proffer is to put into the record testimony which is excluded from the jury so that an appellate court can consider the admissibility of the excluded testimony. Reversible error cannot be predicated on conjecture."). The failure to do so, therefore, prevents appellate review of the excluded items. See Lucas, 568 So.2d at 22; see also Finney v. State, 660 So.2d 674, 684 (Fla.1995) ("Without a proffer it is impossible for the appellate court to determine whether the trial court's ruling was erroneous and if erroneous what effect the error may have had on the result.").
However, even if the issue had been preserved for appellate review, the exclusion of these reports by the trial court did not constitute error as the reports were cumulative to evidence actually admitted during Dr. Garfield's testimony. See Sims v. Brown, 574 So.2d 131, 134 (Fla.1991) ("Even if wrongfully excluded, the exclusion of cumulative testimony is not an adequate basis for vacating a jury verdict."). Appellant has not indicated that the reports contained evidence not otherwise testified to by the expert who testified extensively about matters contained in her reports.
Appellant's remaining argument, that the trial court improperly refused to consider valid mitigating evidence contained in the reports likewise is without merit. As noted above, the expert testified at length about her findings and opinions with respect to appellant. Appellant has not indicated that the reports contained additional mitigating evidence not presented through the witness's in-court testimony. Finally, the sentencing order reflects that the trial court considered the expert's testimony in finding some of the mitigating factors. Accordingly, we find no reversible error in the trial court's exclusion of these reports. Cf. Griffin v. State, 639 So.2d 966 (Fla.1994) (no error in excluding newspaper article at penalty portion of trial where person who wrote article testified at trial and related the information and comments contained in article).

Exclusion of Hearsay Evidence
Appellant also contends that the trial court erred in not permitting Lana Salmon, the victim's friend, to testify as to the contents of a telephone conversation between her and the victim. The trial court granted the State's hearsay objection to Ms. Salmon's testimony that the appellant was at the victim's house during the telephone conversation and that appellant often spent the night at the victim's house. Appellant argues that in excluding this testimony, the trial court failed to consider relevant mitigating evidence that the killing was committed upon reflection of a short duration.
We note that counsel offered no proffer of the testimony Ms. Salmon would have presented had she been permitted to answer defense counsel's questions. Further, despite appellant's assertion to the contrary, the fact that appellant and the victim occasionally spent the night together was admitted in evidence without objection. The only evidence not admitted was the fact that appellant was at the victim's house on the Wednesday before the murder and it is not apparent from defense counsel's questioning that this was, in fact, what he sought to elicit from the witness's testimony. Thus, we do not find that this issue has been adequately preserved for appellate review. See Lucas.
Additionally, we note that even though section 921.141(1) relaxes the evidentiary rules during the penalty phase of a capital trial, the statute clearly states that the defendant must have an opportunity to fairly rebut the hearsay evidence in order for it to be admissible. See Wuornos v. State, 644 So.2d 1012, 1018 (Fla. *412 1994). This rule applies to the State as well. Cf. Hitchcock v. State, 578 So.2d 685, 690 (Fla.1990) (finding no merit to claim that state's ability to introduce hearsay in a penalty proceeding is limited while a defendant's ability to introduce hearsay is unlimited). Thus, while the victim's alleged statement should not have been excluded on hearsay grounds, the trial court did not err in excluding the testimony because the State had no fair opportunity to rebut the statements of the deceased victim. The State could not question the victim to determine whether appellant was even at her house, whether he had been invited there, why he was there, or how long he had been there. Thus, appellant is entitled to no relief on this claim.

Proportionality
Last, we consider appellant's claim that death is inappropriate in this case in light of other, comparable cases in which we reversed the sentence of death. As part of this Court's statutorily mandated role in reviewing capital cases, we must conduct a proportionality review to ensure that the sentence imposed in a particular case is not too great compared to other capital cases. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990) ("Because death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances.") (emphasis added) (citation omitted).
We have never recognized a "domestic dispute" exception to the imposition of the death penalty. See Zakrzewski v. State, 717 So.2d 488, 493 (Fla.1998), cert. denied, 525 U.S. 1126, 119 S.Ct. 911, 142 L.Ed.2d 909 (1999); Spencer v. State, 691 So.2d 1062, 1065 (Fla.1996). Rather, our analysis still focuses on whether death is a proportionate penalty after considering the totality of the circumstances in a particular case. See Pooler v. State, 704 So.2d 1375, 1381 (Fla.1997). We have determined that the death sentence was proportionately warranted for a defendant who murdered someone in a domestic relationship. See, e.g., Pope v. State, 679 So.2d 710 (Fla.1996) (finding defendant's death sentence proportionate for beating and stabbing death of girlfriend where there were two aggravators of previous violent felony conviction and pecuniary gain, both statutory mental mitigators, and several nonstatutory mitigators including defendant's severe intoxication at time of offense and that the violence occurred subsequent to a domestic dispute); Cardona v. State, 641 So.2d 361 (Fla.1994) (upholding mother's sentence of death for murder of her three-year-old son following prolonged torture and abuse where there was single aggravator of HAC, both statutory mental mitigators, and a number of nonstatutory mitigators).[7] Thus, we do not agree with appellant that death is disproportionate in his case.
While only the HAC aggravating circumstance was present in this case, the trial court found that this aggravating circumstance outweighed the mitigating circumstances, including that the appellant and the victim had been involved in a relationship that ended several months before the killing. As explained above, in reviewing a sentencing decision this Court will not disturb the sentencing judge's determination as to "the relative weight to give to each established mitigator" where that ruling is "supported by competent, *413 substantial evidence in the record." Spencer v. State, 691 So.2d at 1064; see also Raleigh v. State, 705 So.2d 1324, 1330 (Fla.1997) ("The weight assigned to a mitigating circumstance is within the trial court's discretion and subject to the abuse of discretion standard.").
The record here shows that the appellant manually strangled the victim, strangled her with wire, lodged a bar of soap and washcloth in the back of her throat, and smothered her with a pillow. Extensive petechia hemorrhaging in the victim's eyes indicates that the appellant applied pressure to her neck, released it, and then reapplied it. There is also evidence that the victim struggled for her life during this attack: hair was ripped from her scalp; there were bruises on her head, neck and body; and objects on a bedside table were knocked to the floor. In light of this evidence, we cannot conclude that the trial court abused its discretion in determining that the HAC aggravator outweighed the mitigators. Thus, we uphold the imposition of the death sentence in this case.

CONCLUSION
For the reasons discussed above, we affirm appellant's conviction for first-degree premeditated murder and affirm his sentence of death.
It is so ordered.
WELLS, C.J., and HARDING, LEWIS and QUINCE, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which SHAW and PARIENTE, JJ., concur.
ANSTEAD, J., concurring in part and dissenting in part.
Significantly, the death sentence imposed in this case rests solely upon a trial court finding of only one aggravating factor. This is important because this Court has consistently held that it will not ordinarily uphold a sentence of death based on a single aggravating factor, unless there is little or no evidence of mitigation. See Almeida v. State, 748 So.2d 922, 933 (Fla. 1999) ("As a general rule, `death is not indicated in a single-aggravator case where there is substantial mitigation.'"); Songer v. State, 544 So.2d 1010, 1011 (Fla. 1989) ("We have in the past affirmed death sentences that were supported by only one aggravating factor, but those cases involved either nothing or very little in mitigation.") (citations omitted). Having established a fairly clear policy for the guidance of judges, prosecutors and defense lawyers, we should not stray from this policy without exceptional cause. That exceptional cause does not exist here. Indeed, it is ironic that we are approving a death sentence where the trial court itself has explicitly stated in its sentencing order that after researching Florida Supreme Court cases involving similar circumstances "this court found no cases upholding the death penalty."
In reviewing all capital cases, we must conduct a careful proportionality review to ensure that the sentence imposed in a particular case is consistent with sentences we have approved in other capital cases:
We have described the "proportionality review" conducted by this Court in every death case as follows:
Because death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances.

Porter v. State, 564 So.2d 1060, 1064 (Fla.1990) (citation omitted) (emphasis added), cert. denied, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991). Accord Hudson, 538 So.2d at 831; Menendez v. State, 419 So.2d 312, 315 (Fla. 1982). The requirement that death be administered proportionately has a variety of sources in Florida law, including *414 the Florida Constitution's express prohibition against unusual punishments. Art. I, § 17, Fla. Const. It clearly is "unusual" to impose death based on facts similar to those in cases in which death previously was deemed improper. Id. Moreover, proportionality review in death cases rests at least in part on the recognition that death is a uniquely irrevocable penalty, requiring a more intensive level of judicial scrutiny or process than would lesser penalties. Art. I, § 9, Fla. Const.; Porter.

Tillman v. State, 591 So.2d 167, 169 (Fla. 1991) (second emphasis added) (footnote omitted). Principled decision making requires that we do our best to provide guidance as to the distinctions we draw in evaluating the propriety of a sentence of death. We have done that in our decisions indicating a general rule disfavoring death sentences in single aggravator cases. See Almeida. Today's decision affirming Blackwood's sentence of death constitutes a blow to principled decision making in our death penalty jurisprudence.
As noted above, the trial court here conceded that it could find no single aggravator cases involving comparable circumstances where this Court has approved the imposition of the death penalty. In fact, the discrepancy in sentencing here becomes immediately apparent when we examine those other single aggravator cases in which we have vacated the sentence of death involving similar circumstances or comparable mitigation. See Sinclair v. State, 657 So.2d 1138 (Fla.1995) (vacating sentence of death for killing of taxicab driver where single merged aggravator did not outweigh evidence in mitigation, including cooperation with police, dull normal intelligence, upbringing without father figure, and emotional disturbances); Klokoc v. State, 589 So.2d 219 (Fla.1991) (vacating defendant's sentence of death for killing his daughter as act of revenge against his wife where sole aggravating factor based on cold, calculated and premeditated circumstance was outweighed by fact defendant acted under extreme emotional distress due to bipolar affective disorder and had no history of prior criminal activity); Penn v. State, 574 So.2d 1079 (Fla.1991) (vacating defendant's sentence of death for killing his mother where sole aggravator based on HAC was outweighed by defendant's heavy drug use and his estranged wife's telling him that his mother stood in the way of their reconciliation); Smalley v. State, 546 So.2d 720 (Fla.1989) (reversing sentence of death where substantial mitigation outweighed finding the murder of baby resulting from eight hours of abuse was HAC; evidence indicated that defendant did not have a record of prior criminal activity, was depressed over family situation, was a good worker and was genuinely remorseful; and that family pressure and marijuana use impaired his ability to appreciate criminality of conduct); Caruthers v. State, 465 So.2d 496 (Fla.1985) (vacating death sentence for killing convenience store clerk where sole aggravatormurder committed during robberydid not outweigh mitigating evidence, including no history of prior criminal activity, voluntary confession, conditional guilty plea, mutual love and affection for family, feelings of remorse, encouragement of younger brother to do well and avoid violating law).
It is also important to note that this Court has reversed death sentences in numerous cases involving even more aggravating circumstances than were involved herein, and with comparable or less mitigation than that presented here. See Wright v. State, 688 So.2d 298 (Fla.1996) (reversing sentence of death where two aggravating circumstances did not outweigh evidence in mitigation, including ongoing struggle with victim, extreme emotional disturbance because appellant was distraught at thought of losing his children, cooperation with police, remorse, good military and employment record, regular church attendance, and mental abuse as a child); Farinas v. State, 569 So.2d 425 (Fla.1990) (reversing sentence of death because two aggravators, including *415 HAC, did not outweigh evidence in mitigation, including extreme emotional disturbance due to appellant's obsession over loss of girlfriend); Blakely v. State, 561 So.2d 560 (Fla.1990) (vacating sentence of death for murder in which defendant bludgeoned wife to death with hammer; two aggravating circumstances, HAC and CCP, were outweighed by fact death occurred as result of long-standing domestic dispute involving financial matters and child-rearing and fact defendant had no history of prior criminal activity); Proffitt v. State, 510 So.2d 896 (Fla.1987) (vacating sentence of death on proportionality grounds despite trial court's finding of two aggravating circumstancesmurder was committed during a burglary and murder was cold, calculated and premeditated; mitigating evidence included lack of history of prior criminal activity, fact that defendant was described as nonviolent, happily married, good worker and responsible employee, that he had been drinking prior to murder but had not made any statements concerning a criminal intent, had not possessed weapon upon entering victim's home, had not attempted to kill victim's wife, and upon fleeing victim's home, confessed to his wife and voluntarily surrendered to police); Wilson v. State, 493 So.2d 1019 (Fla.1986) (vacating sentence of death for premeditated killing of defendant's father despite two aggravating circumstances murder was heinous, atrocious, or cruel and at time of murder, defendant had been previously convicted of felony involving use of violence to some personand trial court's finding of no mitigating circumstances, where murder was result of heated, domestic confrontation and killing, although premeditated, likely resulted upon reflection of short duration).
We should also not overlook the other significant mitigation that clearly establishes that this case is not one of the "least mitigated" cases. Of substantial significance is the fact that appellant had never committed any crimes prior to the murder in this case, a fact which the trial court accorded significant weight as a statutory mitigating factor. Penalty phase witnesses also established that appellant was not a violent person and had never been violent or abusive towards the victim. Further, there was substantial evidence presented of appellant's low intelligence, including testimony from the appellant's friends and family members that appellant was a slow learner and from an unchallenged mental expert finding that appellant fell within the borderline range of low intelligence. Finally, the trial court found and considered appellant's prior steady employment record, good relationship with his son, remorse, cooperation with the police, and capacity for rehabilitation as additional nonstatutory mitigating factors in this case.
Another significant mitigating factor we considered in a number of the above cases, and that is present here, is the fact that the murder arose from the fall-out of an intense and emotional personal relationship.[8] For example, in Wright, the defendant and victim separated after having been married for several years. The victim *416 took the couple's children, moved in with her parents, and refused to permit defendant to visit his children. Apparently distraught over the loss of his children, the defendant broke into his in-laws' house, shot the victim and threatened the victim's mother. Although we upheld the trial court's finding concerning the aggravating circumstances (the murder was committed during a burglary and defendant had been convicted of prior violent felonies), we found that death was disproportionate. We stated that in addition to the nonstatutory mitigating factors found to exist,
[t]he present record is devoid of evidence of prior violent offenses or other aggravation committed by Wright unrelated to the ongoing struggle between him and Allison [victim]. The evidence in mitigation, on the other hand, is copious. The trial court found as a statutory mitigating circumstance that Wright was under the influence of extreme emotional disturbance at the time of the crime. The record shows he was extraordinarily overwrought at the thought of losing his children.
688 So.2d at 301. Similarly, in Farinas, the defendant shot his former girlfriend in the back and head after she had left him, taking their child with her. The evidence revealed that Farinas and the victim had lived together for two years and had a child together. Two months before the murder, the victim had taken the child and moved into her parents' home. The trial court found three aggravating circumstances; the murder was committed during a kidnaping, the murder was HAC, and the murder was CCP. On appeal, we rejected the finding as to CCP, but upheld the trial court's finding as to HAC and murder committed during a kidnaping. See 569 So.2d at 431. Notwithstanding the two aggravating circumstances, however, this Court held that death was a disproportionate penalty because the evidence established that Farinas was under extreme emotional disturbance based on his obsession over the victim and his intense jealousy over the belief that the victim was becoming romantically involved with another man. Id.
This case presents a scenario similar to those in Wright and Farinas. Certainly the fact that the victim had broken off the intimate personal relationship with Blackwood months before the murder does not distinguish this case from those cases. As the record makes clear, the relationship existed for some ten years before the victim attempted to break it off. There is also evidence that appellant maintained contact with the victim in the months preceding the murder, and that appellant was extremely upset over the breakup. Thus, we simply cannot ignore the fact that this murder was spurred by the appellant's emotions toward the victim and his obvious distraught mental state over the demise of their relationship.
SHAW and PARIENTE, JJ., concur.
NOTES
[1] In contrast, one witness claimed that appellant appeared to have above average intelligence.
[2] Spencer v. State, 615 So.2d 688 (Fla.1993).
[3] The court rejected the proposed nonstatutory mitigators of defendant's good conduct in jail and deprived childhood based on the lack of sufficient evidence to support such claims.
[4] These issues include: (1) whether the sentence of death is proportionate; (2) whether there is sufficient evidence of premeditation; (3) whether the trial court erred in finding the murder heinous, atrocious, or cruel (HAC); (4) whether the trial court erred in excluding reports by the mental health expert during the penalty phase of the trial; (5) whether the trial court improperly admitted hearsay evidence during the guilt phase of the trial; (6) whether the trial court improperly rejected the extreme mental or emotional disturbance mitigator; (7) whether the trial court erred in failing to expressly find the sole aggravating circumstance sufficient to justify the death penalty; (8) whether the trial court erred in failing to find age as a mitigator; and (9) whether the trial court improperly excluded hearsay evidence during the penalty portion of the trial. We find issue (7) to be without merit.
[5] As part of this argument, appellant claims that in assessing the extremity of appellant's mental state, the expert incorrectly based her conclusion on her finding that appellant did not exhibit any psychotic disturbances and that he was not insane. In Dixon, we explained that extreme mental or emotional disturbance "is easily interpreted as less than insanity but more than the emotions of an average man, however inflamed." 283 So.2d at 10. Thus, "[t]he finding of sanity ... does not eliminate consideration of the statutory mitigating factors concerning mental condition." Mines v. State, 390 So.2d 332, 337 (Fla.1980); accord Campbell v. State, 571 So.2d 415, 418-19 (Fla.1990). Contrary to appellant's assertion, however, the expert merely stated that appellant did not exhibit the type of psychotic disturbances necessary to conclude that his mental disturbance was "extreme." The expert expressly denied using sanity as the standard for determining whether one is under an "extreme" mental or emotional disturbance. We also stress that this witness was called by the defense in this case. Thus, any alleged error in the witness's assessment or conclusion fell upon defense counsel to rectify.
[6] The arrest affidavit identifies appellant's date of birth as January 18, 1957.
[7] But see Wilson v. State, 493 So.2d 1019 (Fla.1986) (finding death sentence not proportionate for beating father with hammer followed by gunshot to forehead where there were two aggravators of HAC and prior violent felony and no mitigators); Ross v. State, 474 So.2d 1170 (Fla.1985) (death penalty not proportionately warranted for bludgeoning death of wife while she attempted to defend herself where there was single aggravator of HAC and mitigators of drinking at time of attack, angry domestic dispute, and no prior history of violence).
[8] Certainly, the nature of the relationship of the parties is a relevant factor to consider in our proportionality analysis. Of course, this Court has correctly refused to recognize a "domestic dispute" exception to the imposition of the death penalty. See Zakrzewski v. State, 717 So.2d 488, 493 (Fla.1998), cert. denied, 525 U.S. 1126, 119 S.Ct. 911, 142 L.Ed.2d 909 (1999); Spencer v. State, 691 So.2d 1062, 1065 (Fla.1996). However, as the cases involving domestic incidents and personal relationships make clear, the analysis focuses on whether death is a proportionate penalty after considering the totality of the circumstances in a particular case, including the personal emotional relationship of the parties. See Pooler v. State, 704 So.2d 1375 (Fla.1997), cert. denied, 525 U.S. 848, 119 S.Ct. 119, 142 L.Ed.2d 96 (1998). As Justice Barkett once noted, this Court has consistently recognized the intensive emotional circumstances involved in broken personal relationships as a substantial mitigating factor setting those cases apart from other intentional killings in terms of imposition of the death penalty. See Porter v. State, 564 So.2d 1060, 1065 (Fla.1990) (Barkett, J., concurring in part and dissenting in part) (citing cases).