# Supreme Court of Florida

————————

No. SC11-476
————————

**EMILIA L. CARR**,
Appellant,

vs.

**STATE OF FLORIDA**,
Appellee.

[February 5, 2015]

PER CURIAM.

Emilia L. Carr appeals her conviction for first-degree murder and sentence of death. For the reasons below, we affirm.[1]

## BACKGROUND

This case involves a love triangle between the victim, Heather Strong, her estranged husband, Joshua Fulgham, and the defendant, Emilia Carr, that ended when Carr and Fulgham carried out their plan to murder Strong.

———————————————

1. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

The evidence at trial, which included several statements from Carr, established that Strong "wouldn't come within five feet" of Carr because Carr had previously attacked Strong with a knife. So, on the evening of February 15, 2009, Fulgham lured Strong to an isolated mobile home, which was being used as a storage trailer on property where Carr lived in a house with her family, under the pretense that Carr had hidden some money in the trailer. Earlier that day, Fulgham had called Carr, who was seven months pregnant with his child,[2] and asked her whether she was still "down with" what they talked about, referring to their plan to kill Strong. Thinking Fulgham was joking and would not go through with it, Carr responded "yeah, sure, whatever." But when Fulgham showed up at her house with Strong, Carr "knew it was for real."

Acting according to plan, Carr waited in the house for a few minutes before going out to the storage trailer. When Carr entered the trailer, Fulgham had Strong sitting down in a chair and was confronting her about having him arrested the month before for allegedly assaulting her and about her plans to leave Florida and take their two children with her. After Carr entered the trailer, Strong tried to

---

2. After Carr was sentenced, she made a statement in which she claimed that the child she was carrying at the time of Strong's murder was not Fulgham's and that she and the victim, Strong, had been involved in an intimate relationship.

escape and, in the process, knocked Carr down, knocked out one of the trailer's windows, and urinated on herself.

Fulgham wrestled with Strong, dragged her back to the chair, and took her shoes off so that he and Carr could tape her legs together. Using duct tape from the storage trailer, Fulgham held Strong down while Carr taped her to the chair. Carr taped Strong's feet and hands together, but Strong got loose, so Carr taped Strong's hands to the arms of the chair. Carr also taped Strong's body to the chair. During this, Strong said that she did not want to be taped up or held down because she was claustrophobic. Strong was also crying and saying "Josh, why?" and asking Carr for help. Fulgham told Strong that he was doing this "because you keep trying to take my kids." Fulgham then made Strong sign a document that he and his mother had prepared earlier that day purporting to give him custody of their two children. At some point, Carr claimed that Fulgham broke the flashlight that she had brought with her by hitting Strong over the head with it, so Carr found a candle in the trailer to light so that they could see.

After Strong was taped to the chair she "wasn't squirming [and] didn't need to be held down." Carr put a garbage bag (also from the storage trailer) over Strong's head, Fulgham pulled the bag back to tighten it around Strong's head, Carr pulled the duct tape off the roll for Fulgham, and Fulgham wrapped the tape around Strong's neck. Then, Carr made two attempts to break Strong's neck.

When she could not do it, Carr claimed that Fulgham put his hand over Strong's nose and mouth, which were still covered by the plastic bag, and suffocated her. After the murder, Carr wrapped Strong's head in a blanket from the trailer, and Fulgham put her in a suitcase, also from the trailer. Within a day or two, Fulgham returned to Carr's house with a shovel and buried Strong near the trailer.

Nine days after Strong's murder, on February 24, 2009, Strong's cousin reported her missing. Police officers interviewed several people in connection with Strong's disappearance, including Fulgham. Between the night of March 18, 2009, and the early morning hours of March 19, 2009, Fulgham implicated Carr, who was also being interviewed by police, in Strong's murder and led police to the place where Strong's body was buried. Later that day, police obtained a search warrant and recovered Strong's body from a shallow grave under a debris pile near the storage trailer. Strong's body was partially inside a suitcase, and part of her body was wrapped in a blanket. According to the medical examiner, the cause of death was suffocation.

Carr was arrested and charged with Strong's first-degree murder and kidnapping. During the guilt phase, the medical examiner testified that she assisted with excavating the body and obtained a thumb print that was later matched to Strong. She also testified that Strong was wearing a gray tee shirt, jeans, and socks, but no shoes, and that she recovered duct tape from the outside of

Strong's jeans. She further testified that she found a bruise under Strong's scalp in the mid-forehead area that was caused by blunt force trauma that was not life threatening.

Law enforcement recovered evidence from the trailer, including several pieces of duct tape and hairs from the duct tape and an office chair, and documented a broken window in the trailer. Stains on some of the tape tested positive for blood. The FDLE crime lab analyst testified that the presumptive blood stain on one piece of tape matched Strong and that he was able to include Strong on the DNA profile from the second piece of tape. He also testified that the hairs taken from the duct tape and computer chair matched Strong's DNA.

The jury also heard Carr's multiple recorded statements to police and her recorded conversation with Fulgham's sister, who was working with police. Carr's story changed several times. She went from saying that she had not seen Strong since January 2009, to having information she claimed that Fulgham told her about killing Strong, to finding Strong in the trailer the day after Fulgham killed her, to "hypothetically" being an eyewitness to Fulgham killing Strong, and, finally, to helping Fulgham carry out a plan to kill Strong and providing details of her murder. Carr also led police to shoes that she claimed Strong had worn on the night of the murder and accurately described the clothes that Strong was wearing

and how she was buried, including that a blanket was wrapped around part of her body.

Several witnesses testified to threats that Carr had made against Strong in the weeks before her murder. First, James Acome, who was living with Strong at the time of her murder and who is also allegedly the father of one of Carr's four children, testified that he saw Carr pull a knife on Strong in January 2009. Acome testified that, after Strong refused to write a letter to get Fulgham out of jail for allegedly assaulting her, Carr walked up behind Strong, wrapped Strong's hair around her hand, pulled a knife, and put it to Strong's throat. Acome said that he grabbed Carr in a chokehold and she dropped the knife, and then Carr and Strong apologized to each other. Acome further testified that Carr offered him and Jason Lotshaw, who also socialized with Fulgham, Strong, and Carr, $500 to help her kill Strong in early January 2009.

Second, Lotshaw testified that he and Acome took Carr to the store while Fulgham was in jail in January 2009, and on the way Carr offered to pay $500 from her income tax refund to help lure Strong and get her drunk so that Carr could snap Strong's neck. Lotshaw testified that he knew Carr was serious about killing Strong because he had known her for over 10 years.

Last, Christy Stover, who also knew Fulgham, Strong, Carr, Acome, and Lotshaw, testified that Carr called her about once a day for a couple of weeks

while Fulgham was in jail in January 2009. Stover testified that Carr told her, while crying and upset, that she loved Fulgham, that she was pregnant with Fulgham's child, and that she could not live without Fulgham. Stover further testified that during these calls Carr complained to her that she could not find anyone to kill Strong. Stover testified that Carr told her that she wanted to be with Fulgham and was willing to pay someone $500 to kill Strong and that she would do it herself, but she would not be able to move Strong's body because she was pregnant. Stover testified that she thought Carr was just kidding and mad when she made the statements about killing Strong, and that everyone was trying to get money from Carr because she had just gotten her income tax refund.

Carr took the stand and testified that she started lying to police after they threatened that she would not see her baby born. Though Carr admitted to saying that she wanted to kill Strong, she testified that she had also said the same thing about her ex-husband and that she was not serious. Carr denied offering Acome and Lotshaw money to help her kill Strong and denied that she complained to Stover that she could not find anyone to help her kill Strong. Carr also testified that she last saw Strong in January 2009; that Fulgham had never spoken to her about killing Strong; that Fulgham did not call her about coming over to her house with Strong; that she never went outside on the night of the murder, other than to

say goodbye to visiting guests;[3] that she was never in the trailer with Fulgham and Strong; that she never found Strong's body in the trailer; that the shoes she led police to were not Strong's; and that she lied about trying to break Strong's neck, about helping Fulgham tape Strong to the chair, and about putting the garbage bag over Strong's head.

Carr further testified that she used information she learned from police or Fulgham's sister to make it look like she knew something and that she tried to convince Fulgham's sister that she knew something about Strong's murder so Fulgham's sister would provide information that Carr could take to police and use to get her children back. Carr admitted to speaking on the phone with Fulgham on the day of Strong's murder, but stated that they were arguing because he wanted her to put their baby up for adoption. Carr also testified that she does not know

---

3. Carr's mother and sister testified that Carr was at home visiting with guests the night of Strong's murder beginning around 9:00 or 10:00 p.m. Carr's sister testified that she and Carr went to sleep after the last guests left around 10:30 or 11:00 p.m. and that Carr was at home the following morning when she woke up.

Two of Carr's four guests could not be located and subpoenaed during the guilt phase. However, these guests testified during the penalty phase that they arrived at Carr's house sometime after dark on the evening of February 15, 2009, stayed for around thirty minutes, and that Carr did not leave the house while they were there. Acome and Lotshaw were Carr's other guests on the evening of the murder, and Acome testified that they were only at Carr's house for a few minutes.

who killed Strong, and that she did not know that Strong was buried on her property until the police told her.

The jury found Carr guilty of Strong's first-degree murder and kidnapping.

During the penalty phase, the State presented the testimony of the victim's mother, who testified that Strong's children are being adopted by another family because of her murder and that, after the adoption, Strong's family will not be able to see them. The State also played excerpts from Carr's recorded interviews with police and Carr's recorded conversation with Fulgham's sister.

Carr presented the testimony of several of her family members and of one of her ex-husbands, who is also the father of two of her four children. Several of Carr's family members testified that Carr had been sexually abused as a child by her father and grandfather. In addition, Carr's mother testified that, while in jail for the alleged abuse, Carr's father solicited her murder and the murders of Carr and Carr's grandmother.

In addition, Carr presented the testimony of Dr. Ava Land, an expert in forensic psychology. Dr. Land testified that Carr has no indication of any serious mental illness but that she has a bland demeanor in expressing affect, which makes her seem unemotional, and that she has some symptoms of post-traumatic stress and anxiety. Dr. Land further testified that Carr has an IQ of 125 and is more of a leader than a follower. Dr. Land also testified that Carr has no psychosis,

antisocial personality disorder, schizophrenia, loss of reality, or delusions, and that she knows what is going on around her and knows right from wrong.

Regarding Carr's relationships with men, Dr. Land testified that Carr engages in superficial sexual relationships; does not become emotionally attached; is independent; engages in sexual relationships where she is in control and the one enticing and manipulating the relationship; manipulates so that she can be in control; and is on guard against being manipulated. Dr. Land further testified that Carr is acting out her abuse through her relationships but is not submissive and that she could not account for Carr's sexual abuse causing her to murder Strong.

The jury recommended the death penalty by a vote of seven to five, and a Spencer[4] hearing was held on February 17, 2011. At the Spencer hearing, the State introduced excerpts from numerous recorded conversations between Carr and Fulgham that occurred while Fulgham was in jail the month before Strong's murder for an alleged assault on Strong. These tapes included conversations regarding Strong, during which Carr said to Fulgham, "[L]eave it to me from here on out" and "I'm an a**-kicker. You're too much of a p**** to do s***." Carr presented additional testimony from her brother about her childhood sexual abuse, and Carr also testified about her charitable work and church attendance as a child.

---

4. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

- 10 -

Thereafter, the trial court followed the jury's recommendation and sentenced Carr to death, concluding that the aggravating circumstances[5] outweighed the mitigating circumstances.[6]

---

5. The trial court found the following aggravators: (1) in the commission of a kidnapping (great weight); (2) heinous, atrocious, or cruel (great weight); and (3) cold, calculated, and premeditated (great weight).

6. The trial court found one statutory mitigator, namely that Carr has no significant history of prior criminal activity (significant weight) and rejected the following proposed statutory mitigators: (1) that Carr was under the influence of extreme mental or emotional disturbance (not proven); (2) that Carr acted under extreme duress or under the substantial domination of Fulgham (not proven); and (3) that Carr was 24 years old at the time of the crime (not mitigating because no evidence age impacted Carr's actions).

In addition to the one statutory mitigator, the trial court found the following nonstatutory mitigators: (1) Carr had a poor upbringing (little weight); (2) Carr had an unprotecting mother (little weight); (3) Carr was raised in a dysfunctional family (little weight); (4) Carr was a good sister (little weight); (5) Carr suffered no mental illness or cognitive brain dysfunctions (little weight); (6) Carr was bright, a good student, and graduated from high school (little weight); (7) Carr was a good mother (little weight); (8) Carr was a good daughter (little weight); (9) Carr performed community service and charitable or humanitarian deeds (little weight); (10) Carr regularly attended church and Bible study as a child (little weight); (11) Carr completed modeling school (little weight); (12) Carr completed massage therapy school (little weight); (13) Carr participated in ROTC in high school (little weight); (14) Carr was not a violent person (little weight); (15) Carr was a teenage mother (little weight); (16) Carr was a single parent (little weight); (17) Carr is bilingual (little weight); (18) the murder was an isolated incident (some weight); (19) the mental health expert's testimony supports a life sentence (little weight); (20) the presentence investigation report includes an alternative recommendation of consecutive life sentences (some weight); (21) life in prison without possibility of parole meets the needs of society (some weight); (22) the jury recommendation for death was a bare majority of seven to five (little weight); (23) Carr has the support of friends and family (little weight); (24) Carr was sexually abused as a child by her grandfather and father and removed from the home after she reported

## ISSUES ON APPEAL

Carr raises the following issues on appeal: (1) whether the trial court's evidentiary rulings as to the admissibility of certain documents were proper; (2) whether the trial court erred by denying her motions to continue; (3) whether prosecutorial comments warrant a new penalty phase; (4) whether the trial court erred in its treatment of the mitigating evidence; (5) whether the trial court erred in finding the cold, calculated, and premeditated (CCP) aggravator; (6) whether the trial court erred in finding the heinous, atrocious, or cruel (HAC) aggravator;[7] and

the abuse (little weight); (25) Carr was experiencing a high-risk pregnancy at the time of the offense (little weight); (26) Carr voluntarily gave statements to law enforcement and was generally cooperative (little weight); and (27) Carr did not flee from law enforcement (little weight).

However, the trial court rejected the following proposed nonstatutory mitigators: (1) Carr is intelligent (not mitigating); (2) Fulgham manipulated and controlled Carr (not proven); (3) Fulgham played the victim and Carr against each other (not proven); (4) Carr is immature and wanted a relationship (not proven); (5) Fulgham actually killed Strong (not mitigating based on conviction; even if mitigating, little weight would be given to evidence that Carr did not tape the bag over Strong's head); (6) Carr did not intend for the kidnapping or murder to occur (not mitigating based on conviction; even if mitigating, little weight would be given based on overwhelming evidence that Carr participated in planning and carrying out crime); and (7) Carr's statements are the only proof of her involvement in the crime (not proven and not mitigating because lingering doubt is not a mitigating factor; even if mitigating, little weight would be given).

7. In her arguments challenging the trial court's CCP and HAC findings, Carr states that the in the course of a felony aggravator, which was based on her conviction for Strong's contemporaneous kidnapping, was given too much weight. However, Carr does not explain why giving this aggravator great weight was an abuse of discretion, and we affirm the trial court. See Sexton v. State, 775 So. 2d

(7) whether her death sentence is proportionate.[8]  We also review whether the evidence is sufficient to support Carr's conviction.  As explained below, none of these issues warrants relief.

## 1.  Evidentiary Rulings

In her first claim, Carr challenges the trial court's evidentiary rulings on the admissibility of certain documents, namely (a) the admission of a school record on which Fulgham listed Carr as an emergency contact for one of his and Strong's children shortly after Strong's murder; and (b) the exclusion of Fulgham's 2004 arrest report for an alleged battery against Strong and Fulgham's 2008 petition for a domestic violence injunction against Strong.  We affirm the trial court.

**(a)  School Record**

_____

923, 934 (Fla. 2000) ("[T]he weight to be accorded an aggravator is within the discretion of the trial court and will be affirmed if based on competent substantial evidence.").

8. Carr also raises two constitutional challenges, neither of which entitles her to relief.  First, she contends that imposing the death sentence based on the jury's seven-to-five majority vote is unconstitutional.  However, we have "repeatedly held that it is not unconstitutional for a jury to recommend death on a simple majority vote" and therefore deny relief.  Parker v. State, 904 So. 2d 370, 383 (Fla. 2005).  Second, Carr argues that Florida's capital sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002).  We need not address Carr's Ring claim, however, because the trial court found the aggravating circumstance of in the course of a felony based on Carr's conviction for Strong's contemporaneous kidnapping.  See Baker v. State, 71 So. 3d 802, 824 (Fla. 2011).

Carr first argues that the school record should have been excluded because it violates her right to confrontation under Crawford[9] and because its probative value is substantially outweighed by the danger of unfair prejudice under section 90.403, Florida Statutes, since it is an official business record dated just days after Strong's murder that links her to Fulgham. However, Carr failed to preserve these issues for our review.

We have repeatedly held that "to raise an error on appeal, a contemporaneous objection must be made at the trial level when the alleged error occurred." J.B. v. State, 705 So. 2d 1376, 1378 (Fla. 1998). While section 90.104(1), Florida Statutes (2010), provides that, "[i]f the court has made a definitive ruling on the record admitting . . . evidence, either at or before trial, a party need not renew an objection . . . to preserve a claim of error for appeal," the statute does not apply to the facts of this case. Here, Carr's trial counsel objected to the school record's admission at a pretrial hearing, and the trial court ruled that the record was admissible. However, when the State offered the record into evidence during the guilt phase, Carr's trial counsel affirmatively stated "[n]o objection." In so doing, trial counsel abandoned her pretrial objections to the record's admissibility, and we decline Carr's invitation to revive them.

---

9. Crawford v. Washington, 541 U.S. 36 (2004).

Because Carr did not preserve her objections to the school record's admissibility, we review its admission only for fundamental error. See Braddy v. State, 111 So. 3d 810, 840 (Fla. 2012) (recognizing unpreserved issues are reviewed only for fundamental error), cert. denied, 134 S. Ct. 275 (2013). "Fundamental error is error that 'reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.'" Archer v. State, 934 So. 2d 1187, 1205 (Fla. 2006) (quoting Kilgore v. State, 688 So. 2d 895, 898 (Fla. 1996)).

We find no error, let alone fundamental error, in the trial court's admission of the school record under the business record exception to the hearsay rule. See § 90.803(6), Fla. Stat. (2010). This record, kept in the ordinary course of the school's business, is not testimonial and therefore does not implicate Crawford. See State v. Johnson, 982 So. 2d 672, 677-78 (Fla. 2008) (distinguishing "between records that are prepared as a routine part of a business's operation and records that are prepared and kept at the request of law enforcement agencies and for the purpose of criminal prosecution" and finding that only the latter records implicate Crawford). Moreover, the fact that the record links Carr to Fulgham shortly after Strong's murder does not "go beyond the inherent prejudice associated with . . . relevant evidence" necessary to require its exclusion under section 90.403. State v.

Gad, 27 So. 3d 768, 770 (Fla. 2d DCA 2010).  Therefore, it was not error, much less fundamental error, for the trial court to admit the school record.

**(b)  Arrest Report and Petition for Injunction**

Next, Carr argues that the trial court erred by excluding Fulgham's 2004 arrest report for an alleged battery against Strong and Fulgham's 2008 petition for a domestic violence injunction against Strong.  Specifically, she argues that these documents should have been admitted as reverse-Williams[10] rule evidence during the guilt phase and that they should have been considered admissible hearsay during the penalty phase under section 921.141(1), Florida Statutes (2010).  We affirm the trial court.

First, the trial court did not err by excluding these documents during the guilt phase.  We have repeatedly held that reverse Williams rule evidence is admissible subject to the other exclusionary rules.  See Crump v. State, 622 So. 2d 963, 969 (Fla. 1993) (holding that "hearsay that does not fall within one of the hearsay exceptions. . . . does not constitute reverse Williams rule evidence because it would not have been admissible had the other suspect been on trial for the present offense").  Even assuming the relevancy of Fulgham's arrest report and petition for injunction, Carr acknowledges that these documents are hearsay and

---

10.  Williams v. State, 110 So. 2d 654 (Fla. 1959).

- 16 -

has never argued that they fall within any exception to the hearsay rule, nor do they. Accordingly, the trial court did not err by excluding them during the guilt phase.

The trial court also did not err by excluding these documents during the penalty phase. Carr argues that Fulgham's arrest report and petition for injunction should have been admitted over the State's hearsay objection because section 921.141(1) affords only the defendant a fair opportunity to rebut any hearsay statements during the penalty phase. However, this Court has repeatedly recognized that the State must be given the same opportunity as the defendant to rebut hearsay statements. See Frances v. State, 970 So. 2d 806, 813-14 (Fla. 2007) ("While [section 921.141(1)] 'relaxes the evidentiary rules during the penalty phase of a capital trial, the statute clearly states that the defendant must have an opportunity to fairly rebut the hearsay evidence in order for it to be admissible. This rule applies to the State as well.' ") (quoting Blackwood v. State, 777 So. 2d 399, 411-12 (Fla. 2000)).

In this case, the State did not have the opportunity to rebut hearsay statements contained in Fulgham's arrest report or petition for injunction because none of the declarants testified and therefore were not subject to cross-examination. Accordingly, the trial court did not abuse its discretion by excluding these documents during the penalty phase.

## 2. Motions to Continue

In her second claim, Carr argues that the trial court erred by denying her motions to continue. We disagree.

This Court has explained:

A court's ruling on a motion for continuance will only be reversed when an abuse of discretion is shown. An abuse of discretion is generally not found unless the court's ruling on the continuance results in undue prejudice to the defendant. This general rule is true even in death penalty cases. While death penalty cases command [the] closest scrutiny, it is still the obligation of an appellate court to review with caution the exercise of experienced discretion by a trial judge in matters such as a motion for a continuance.

Doorbal v. State, 983 So. 2d 464, 486 (Fla. 2008) (quoting Hernandez-Alberto v. State, 889 So. 2d 721, 730 (Fla. 2004)).

Carr identifies two specific requests for a continuance. The first occurred several weeks before trial when defense counsel informed the trial court at a pretrial hearing that Carr wanted a continuance of the guilt phase because she believed her counsel was not prepared for trial. The trial court inquired of both Carr and her counsel (who stated that she would be prepared for trial) and ruled that no evidence had been presented establishing defense counsel's ineffectiveness for Nelson[11] purposes. However, the trial court did not specifically rule on the motion to continue. Second, before the guilt phase began, Carr's trial counsel

---

11. Nelson v. State, 875 So. 2d 579 (Fla. 2004).

requested a continuance of the penalty phase, citing difficulty communicating with Carr's mental health expert. The trial court denied this motion.

Regarding Carr's request for a continuance of the guilt phase, Carr has failed to demonstrate the undue prejudice necessary to establish that the trial court abused its discretion. To the contrary, at the beginning of the guilt phase, Carr's trial counsel affirmatively represented on the record that she was ready to proceed, and Carr has not explained why she needed additional time to prepare for the guilt phase.

Similarly, the trial court's denial of Carr's motion to continue the penalty phase did not unduly prejudice Carr. Before the guilt phase began, Carr's mental health expert appeared before the trial court and represented that she would be prepared to testify at the penalty phase if she did not have to file a written report. Carr did not object to proceeding in this manner. Then, at the beginning of the penalty phase, Carr's trial counsel represented that she was ready to proceed with Carr's mitigation and did not renew her motion to continue. Though Carr contends that her mental health expert's testimony was more harmful than helpful to her case, she fails to explain how the testimony would have improved or changed had the trial court continued the penalty phase, or how having a written report from this expert would have aided her case in mitigation.

Accordingly, as Carr was not unduly prejudiced by the trial court's rulings, the trial court did not abuse its discretion by denying Carr's motions to continue. See Doorbal, 983 So. 2d at 486.

### 3. Prosecutorial Comments

Carr next argues that the trial court erred by overruling her objections to certain prosecutorial comments during the penalty phase closing argument because these comments (a) improperly denigrated her history of sexual abuse; and (b) improperly evoked sympathy by arguing victim impact evidence as aggravation, and that the trial court also erred by denying her motion for a mistrial based upon these comments. Carr argues that these alleged errors separately and cumulatively warrant a new penalty phase. We disagree.

**(a) Sexual Abuse**

Carr first argues that the prosecutor improperly denigrated her history of sexual abuse by suggesting that it should be given less weight because the abuse was not connected to Strong's murder. However, because the prosecutor's comment was not improper, the trial court did not abuse its discretion in denying a mistrial based on this comment. See Belcher v. State, 961 So. 2d 239, 255-56 (Fla. 2007) (reviewing first whether the challenged prosecutorial comments were improper).

"This Court has long recognized that a prosecutor cannot improperly denigrate mitigation during a closing argument." Williamson v. State, 994 So. 2d 1000, 1014 (Fla. 2008). Improper denigration includes comments characterizing mitigation as "flimsy," "phantom," and "excuses." See Brooks v. State, 762 So. 2d 879, 904 (Fla. 2000). However, this Court has also recognized that it is not improper for a prosecutor to "attempt[] to rebut mitigating evidence argued by the defense." Poole v. State, 997 So. 2d 382, 395 (Fla. 2008). For example, in Poole, 997 So. 2d at 395 n.5, we held that it was not improper for the prosecutor to suggest that the jury "shouldn't care what [the defendant] was doing in the fourth grade" since he was 39 years old when he murdered the victim.

Nor is it improper to suggest that the jury should put mitigating evidence in context. See Cox v. State, 819 So. 2d 705, 718 (Fla. 2002). For example, in Cox, 819 So. 2d at 718, we held that a prosecutorial comment "designed to convey the concept that while the mitigator [relating to the defendant's traumatic childhood] may be valid, perhaps its weight should be somewhat discounted because of the passage of time and the lack of an evidentiary nexus to the defendant[,] is a valid argument."

In this case, the prosecutor acknowledged that Carr's history of sexual abuse was a mitigating circumstance and asked the jury to put it in context based on the mental health expert's testimony that Carr's abuse did not contribute to Strong's

murder.  Accordingly, since the prosecutor's comment was not improper, we affirm the trial court.  See Poole, 997 So. 2d at 395 n.5; Cox, 819 So. 2d at 718.

**(b)  Sympathy/Victim Impact Evidence**

Carr also argues that the prosecutor improperly evoked sympathy by arguing victim impact evidence as aggravation.  Specifically, Carr takes issue with the prosecutor's reference to Strong's children being in adoptive homes as a result of her murder when he addressed the weight to be given to mitigation that Carr was a good mother and had a difficult childhood.

This Court has held that it is improper for a prosecutor to "inform[] jurors that they [can] weigh the victim impact evidence as aggravation." Card v. State, 803 So. 2d 613, 621-22 (Fla. 2001).  However, this Court has recognized the propriety of "comments that are 'a fair statement of the evidence produced during the trial.' " Delhall v. State, 95 So. 3d 134, 168 (Fla. 2012) (quoting Pagan v. State, 830 So. 2d 792, 809 (Fla. 2002)).  For example, in Stephens v. State, 975 So. 2d 405, 416 (Fla. 2007), this Court held that it was not improper for the prosecutor to "comment[] on the impact [the victim's] death had on his friends and family." Moreover, in Cox, 819 So. 2d at 718, this Court recognized that the prosecutor may properly argue that a mitigator should be given less weight based on the facts of the case.

In this case, the prosecutor did not tell the jurors that they could weigh the impact of Strong's murder on her family as aggravation. Instead, as allowed by Delhall and Stephens, he stated what was established by Strong's mother's testimony—that Strong's children are being adopted by another family as a result of her murder. In addition, the prosecutor acknowledged that Carr's difficult childhood and mothering abilities constitute valid mitigation. However, as permitted by Cox, he argued that the jury should not give those mitigators much significance under the facts of the case. Therefore, the prosecutor's comment was not improper.

However, even assuming that the prosecutor's comment was improper, it was harmless beyond a reasonable doubt, and the trial court did not abuse its discretion in denying Carr's motion for a mistrial. See Belcher, 961 So. 2d at 255 (explaining that, where the trial court overrules an objection to improper prosecutorial comments, this Court reviews the comments for harmless error and the denial of the motion for mistrial based upon the comments for abuse of discretion). After making the comment, the prosecutor stated that Strong's mother's testimony could not be used as aggravation and that sympathy cannot factor into the jury's sentencing recommendation. Further, after closing arguments, the trial court gave the standard jury instructions on sympathy and victim impact evidence. And the trial court accepted the mitigating circumstances

that Carr is a good mother and had a difficult childhood.  Accordingly, because there is no reasonable possibility that the prosecutor's adoption comment affected the outcome, any error was harmless.  See State v. DiGuilio, 491 So. 2d 1129, 1138-39 (Fla. 1986) (explaining that an error is harmless beyond a reasonable doubt where there is no reasonable possibility that the error affected the outcome).  Nor did the trial court's failure to grant a mistrial deprive Carr of a fair penalty phase.  See Gore v. State, 784 So. 2d 418, 427 (Fla. 2001) (explaining that a mistrial should be granted only when necessary to ensure that the defendant receives a fair trial).  Therefore, the trial court did not abuse its discretion by denying Carr's motion for a mistrial.

### 4.  Mitigating Evidence

Next, Carr raises several challenges to the trial court's treatment of the mitigating evidence.  Specifically, she argues that the trial court abused its discretion by (a) requiring a nexus between several mitigators pertaining to Carr's difficult childhood and Strong's murder; (b) using lawyer argument as evidence to reject or lessen the weight given to several mitigators; and (c) giving certain mitigating circumstances little weight.  Each of these arguments is without merit.

**(a)  "Nexus" Statements**

First, Carr claims that the trial court improperly required a nexus between several mitigating circumstances and Strong's murder.  Specifically, Carr points to

the trial court's findings concerning several mitigators relating to her difficult childhood (i.e., poor upbringing, unprotecting mother, dysfunctional family, and childhood sexual abuse), all of which were given little weight.

This Court has recognized that a trial court may not "enforce a nexus requirement" that results in the rejection of a mitigating circumstance unless it is connected to the murder. Cox, 819 So. 2d at 723. However, a trial court does not violate this prohibition by "attempt[ing] to place the [defendant's] mitigation evidence in context." Id. For example, in Cox, 819 So. 2d at 723 & n.15, we held that the trial court did not abuse its discretion by refusing to give any weight to the defendant's "heightened anxiety in dealing with other people" because the evidence did not "support any conclusions or even speculations as to how it contributed to [the defendant's] decisions and actions that led to [the victim's] death."

Here, the trial court did not use a nexus requirement to reject valid mitigation. To the contrary, the trial court accepted all of the challenged mitigators and gave them little weight after considering them in the context of Carr's decisions and actions in this case. For example, the trial court reasoned that these mitigators were entitled to little weight because Carr's difficult upbringing did not prevent her from participating in many positive and productive activities, like charitable work and massage therapy school.

Further, though Carr also disagrees with the weight given to these mitigators (especially her history of childhood sexual abuse), this Court has held that "mere disagreement with the force to be given [mitigating] evidence is an insufficient basis for challenging a sentence." Quince v. State, 414 So. 2d 185, 187 (Fla. 1982). Accordingly, the trial court did not abuse its discretion in its treatment of the mitigators pertaining to Carr's difficult childhood.

**(b) Lawyer Argument**

Next, Carr contends that the trial court erred because it quoted defense counsel's arguments concerning Carr being "her own person" and "the promise of her family" in its sentencing order when (i) rejecting the statutory mitigator that Carr acted under extreme emotional distress or under the substantial domination of another person; and (ii) rejecting or giving little weight to several non-statutory mitigators, namely that the mental health expert's testimony supports a life sentence, that Carr had a poor upbringing, and that Carr was immature and wanted a relationship. Carr misconstrues the sentencing order. In addition to quoting defense counsel's accurate summary of the evidence, the detailed sentencing order identifies competent, substantial evidence supporting its findings on each of the challenged mitigators. Accordingly, we find no abuse of discretion. See Blackwood, 777 So. 2d at 409 ("Whether a mitigator has been established and the appropriate weight to be given to that mitigator are matters within the discretion of

the trial judge based upon the evidence presented. The trial court's finding is not subject to reversal merely because the appellant reaches a different conclusion.") (citations omitted).

**(c) Weighing Mitigation**

Carr also claims that the trial court failed to properly weigh numerous mitigating factors[12] by turning valid mitigation into aggravation and by abdicating its role to independently find and weigh mitigation. The sentencing order belies Carr's claim.

First, while it is improper to treat valid mitigation as aggravation, the trial court did not do this. See Barclay v. State, 470 So. 2d 691, 694 (Fla. 1985) (recognizing the impropriety of "turn[ing] one of the statutory mitigating circumstances . . . into a nonstatutory aggravating circumstance"). Instead, the sentencing order explains why, in the context of Carr's case, the trial court gave little weight to the mitigators that Carr contends were improperly treated as aggravators. Where the trial court's findings are supported by competent,

---

12. Carr takes issue with the trial court's findings on the mitigating circumstances that she (i) had a dysfunctional family; (ii) was a bright student who graduated from high school; (iii) was a good mother and daughter; (iv) participated in community service and charitable work, church, and ROTC; (v) completed massage therapy and modeling school; (vi) was a teenage mother and a single parent; (vii) has the support of her friends and family; and (viii) was experiencing a high-risk pregnancy at the time of Strong's murder.

substantial evidence, as they are in this case, the weight to be given to the mitigating circumstances is within the trial court's discretion. See Blackwood, 777 So. 2d at 409.

Second, the detailed findings in the trial court's sentencing order plainly show that the trial court considered all relevant mitigating factors and reached an independent judgment regarding the appropriate sentence. See Rogers v. State, 511 So. 2d 526, 536 (Fla. 1987) ("[T]he mere fact that the trial judge agrees with the jury's recommendation is not error where the record reflects, as here, that the court has weighed relevant factors and reached its own independent judgment about the reasonableness of the jury's recommendation.").

Accordingly, because Carr's multiple challenges to the trial court's treatment of the mitigating circumstances are without merit, we affirm the trial court.

### 5. CCP

Carr next argues that the trial court erred by finding the CCP aggravator. Specifically, Carr contends that the fact that she gave inconsistent statements precludes the trial court from relying on her statements in support of its CCP finding, and that other evidence (such as her own statements that her threats against Strong's life were empty) negates the CCP finding. Carr further contends that the "emotionally charged love triangle" between herself, Fulgham, and Strong,

as well as the State's alleged failure to establish the prior procurement of the weapons used in Strong's murder, and the trial court's alleged vicarious application of the CCP aggravator to her based on Fulgham's actions require this Court to strike the CCP aggravator. Carr's arguments are without merit.

This Court has explained the application of the CCP aggravator as follows:

> A determination of whether CCP is present is properly based on a consideration of the totality of the circumstances. See Hudson v. State, 992 So. 2d 96, 116 (Fla. 2008); Lynch [v. State], 841 So. 2d [362,] 372 [(Fla. 2003)]. The scope of review is limited "to ensuring that the trial court applied the correct rule of law, and if so, that there is competent, substantial evidence to support its findings" as to an aggravating factor. Caballero v. State, 851 So. 2d 655, 661 (Fla. 2003) (citing Willacy v. State, 696 So. 2d 693, 695 (Fla. 1997)). For CCP to be found, the killing must be "the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification." Franklin v. State, 965 So. 2d 79, 98 (Fla. 2007).

Gill v. State, 14 So. 3d 946, 962 (Fla. 2009).

Here, the trial court applied the correct law, and competent, substantial evidence supports its CCP finding, much of which the trial court identified in its thorough sentencing order:

> First, the killing was "cold." Heather Strong's death was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage. . . . Carr's actions were not only calm and careful, but they exhibited a degree of deliberate ruthlessness, as shown by her attempt to break Heather Strong's neck as Strong asked . . . Carr to help her. Second, the killing was "calculated." . . . Carr

participated in a careful plan and prearranged design to commit this murder before the fatal incident. At trial there was testimony that [Carr] offered money for help "snapping the victim's neck," and offered money to have the victim killed. Jason Lotshaw testified that [Carr] offered him money to kill the victim, and Christie Stover testified that [Carr] was trying to find someone to help her kill the victim, and she was willing to pay. Third[,] Carr exhibited "heightened premeditation." The evidence in this case was that . . . Carr is a deliberate and calculated person. This is evident from the testimony of the State's witnesses, but is emphasized by the statements of the defendant herself . . . . Fourth[,] Carr acted with no pretense of moral or legal justification.

　　　Carr had harbored anger against Strong since December of 2008 when Strong reconciled with Fulgham, which caused Fulgham to throw . . . Carr out of the house. This anger intensified when Strong then had Fulgham arrested and held in jail for threatening her with a shotgun. In attempting to get Fulgham released from jail, Carr threatened Strong with a knife. After Fulgham's release, and on the day of Strong's disappearance and murder[,] Carr and Fulgham discussed still being "down" or willing to participate in what they had already talked about. Carr waited until Fulgham had gotten Heather Strong into the dark, isolated storage trailer to go out and assist Fulgham in binding her and then suffocating her. There were numerous opportunities for . . . Carr to renounce her planned activity, but she chose instead to participate in the murder.

Accordingly, the trial court did not err by finding CCP. See Barnhill v. State, 834 So. 2d 836, 850 (Fla. 2002) ("A trial judge is not prevented from relying on specific statements made by the defendant if they have indicia of reliability, even if the defendant has given several conflicting statements."); State v. Coney, 845 So. 2d 120, 133 (Fla. 2003) ("Evidence contrary to the circuit court's ruling is outside the scope of the inquiry[,] for a reviewing court cannot reweigh the 'pros and cons' of conflicting evidence."); Harris v. State, 843 So. 2d 856, 867-68 (Fla.

2003) (affirming trial court's CCP finding in murder that involved a domestic violence situation where the facts established that the murder was planned weeks before it occurred and that the murder was calm and deliberate rather than committed in the heat of passion after the defendant lost emotional control).

### 6. HAC

Carr also argues that the trial court erred by finding the HAC aggravator. She specifically claims that the trial court erred by vicariously applying the HAC aggravator to her based on Fulgham's actions since she did not know that Fulgham intended to kill Strong, much less in a brutal manner. Carr further argues that the trial court erred by relying on her prior threat against Strong's life because it was unrelated to the murder. Carr's arguments are without merit.

We review the record to determine whether the trial court applied the correct law and whether competent, substantial evidence supports the trial court's HAC finding. See Lynch v. State, 841 So. 2d 362, 369 (Fla. 2003) (reviewing trial court's finding on HAC for competent, substantial evidence). We have explained that

> HAC focuses on the means and manner in which the death is inflicted and the immediate circumstances surrounding the death, rather than the intent and motivation of a defendant, where a victim experiences the torturous anxiety and fear of impending death. See Brown v. State, 721 So. 2d 274, 277 (Fla. 1998). Thus, if a victim is killed in a torturous manner, a defendant need not have the intent or desire to inflict torture, because the very torturous manner of the victim's death is evidence of a defendant's indifference.

Barnhill, 834 So. 2d at 849-50.

Further, we have repeatedly recognized the appropriateness of the HAC aggravator in strangulation deaths; and strangulation, like suffocation, is a type of asphyxiation. See, e.g., id. at 850 ("Because strangulation of a conscious victim involves foreknowledge and the extreme anxiety of impending death, death by strangulation constitutes prima facie evidence of HAC."); see also Stephens, 975 So. 2d at 423 ("We have consistently upheld the HAC aggravator in cases where a conscious victim was strangled.").

In this case, the trial court applied the correct law and cogently explained the following competent, substantial evidence of the HAC aggravator:

> The evidence at trial established that approximately a month before the actual murder of Heather Strong[,] Carr held a knife to Heather Strong's throat in an attempt to get Strong to sign a document that would be used to get charges against . . . Fulgham dropped[.] Notwithstanding the fact that this threat occurred a month prior to the murder, it is a factor that may, and should be considered based upon the circumstances in this case.
> The facts of this case portray a terrifying scene on the night of the murder where Heather Strong is so scared that she urinates in her pants as she tries to flee the mobile home. Her escape fails when she runs into the defendant. Heather Strong is hit in the head with a flashlight and restrained on a chair. In the dark of night, the mobile home being illuminated by candlelight, Heather Strong can hear duct tape being ripped from the roll and feel it being used to bind her to the chair. While crying she asks why they are doing this and asks for help, but instead of helping her, the defendant tries to break her neck. A plastic bag is placed over [Strong's] head and duct taped in place by taping around her neck. For approximately five minutes she is conscious, aware of her surroundings, aware that she will not get

- 32 -

away, and aware that she is going to die. Suffocation eventually causes her to become unconscious and then die.

Accordingly, the trial court did not err by finding HAC. See Hitchcock v. State, 991 So. 2d 337, 355 (Fla. 2008) ("[A] threat on the victim's life contributes to the victim's apprehension prior to death and is thus relevant to the HAC aggravating factor. A threat need not be made contemporaneously with the murder in order to be relevant to the HAC aggravator if it causes the victim to experience fear, emotional strain, and terror in the moments leading up to [the victim's] murder.").

### 7. Proportionality

Carr next argues that her death sentence is not proportionate because her murder of Strong was not among the most aggravated and least mitigated of first-degree murders.[13] We disagree.

In all death penalty cases, our precedent requires us to consider whether the defendant's death sentence is proportional in comparison to other cases in which the death penalty has been upheld. See Shere v. Moore, 830 So. 2d 56, 60-61 (Fla.

---

13. As part of her proportionality argument, Carr also raises a relative culpability claim based on the fact that, while her direct appeal was pending in this Court, her codefendant (Joshua Fulgham) was also convicted of Strong's first-degree murder and sentenced to life in prison without the possibility of parole. We decline to address Carr's claim that Fulgham's sentence renders her death sentence disproportionate in this direct appeal, without prejudice for Carr to raise it in a timely filed rule 3.851 motion.

- 33 -

2002). In conducting our proportionality analysis, we do not compare the number of aggravating and mitigating circumstances. Crook v. State, 908 So. 2d 350, 356 (Fla. 2005). Rather, we " 'look[] at the totality of the circumstances to determine if death is warranted in comparison to other cases where the sentence of death has been upheld.' " Pham v. State, 70 So. 3d 485, 500 (Fla. 2011) (quoting England v. State, 940 So. 2d 389, 408 (Fla. 2006)). In addition, we have recognized that, qualitatively, "CCP and HAC are two of the weightiest aggravating factors in Florida's capital sentencing scheme." King v. State, 89 So. 3d 209, 232 (Fla. 2012).

Carr's case involves a suffocation murder for which the jury recommended death by a vote of seven to five. The trial court found three aggravating circumstances beyond a reasonable doubt—CCP, HAC, and in the course of a felony (Strong's contemporaneous kidnapping)—and gave them all great weight. As the sole statutory mitigating circumstance, the trial court found that Carr has no significant history of prior criminal activity and gave this circumstance significant weight. In addition, the trial court found numerous non-statutory mitigating circumstances, which it afforded little or some weight. Examples include: the defendant's poor upbringing (little weight); the defendant's history of childhood sexual abuse (little weight); the defendant was a good mother, daughter, and sister (little weight); the murder was an isolated incident (some weight); and life without

- 34 -

the possibility of parole meets the needs of society (some weight). After weighing all aggravating and mitigating circumstances, the trial court concluded that, "[d]espite the existence of the mitigating circumstances and the weight assigned to each by this court, the nature and quality of those circumstances is clearly outweighed by the aggravating circumstances."

Under the totality of the circumstances, Carr's death sentence is proportional "[w]hen compared to other cases where sentences of death have been affirmed." Pagan v. State, 830 So. 2d 792, 817 (Fla. 2002). For example, we have repeatedly upheld death sentences in asphyxiation murders with aggravating and mitigating circumstances comparable to the facts of this case. See, e.g., Barnhill , 834 So. 2d 836 (death sentence proportionate in strangulation murder where trial court found the following aggravators: HAC, CCP, in the commission of a robbery or burglary (which this Court held subsumes the pecuniary gain aggravator), and felony probation; and several mitigators, including that the defendant had a difficult childhood and was neglected by his mother and has psychiatric disorders); Blackwood, 777 So. 2d 399 (death sentence proportionate in asphyxiation murder where trial court found HAC aggravator and several mitigators, including: defendant has no significant history of prior criminal conduct; emotional disturbance at the time of the crime; murder resulted from lover's quarrel; defendant is a good parent; and defendant has capacity for rehabilitation).

Similarly, we have upheld death sentences for murders committed during the course of a kidnapping with aggravating and mitigating circumstances comparable to the facts of this case. See, e.g., Walker v. State, 957 So. 2d 560, 585 (Fla. 2007) (death sentence proportionate in murder committed during the course of a kidnapping where the trial court found CCP, HAC, and in the course of a felony aggravators and several mitigators, including the defendant's drug use/bipolar personality/sleep deprivation, that the defendant's codefendant received a life sentence, and that the defendant gave a statement to police).

And, though Carr claims that she was not the actual killer, we have held that a death sentence is proportionate where the defendant participated in a felony murder and "actively pursued and encouraged" the victim's murder even though the defendant was not the actual killer. Chamberlain v. State, 881 So. 2d 1087, 1108 n.12 (Fla. 2004).

Accordingly, Carr's sentence is proportionate.

### 8. Sufficiency

Finally, we have "a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed." Miller v. State, 42 So. 3d 204, 227 (Fla. 2010); see also Fla. R. App. P. 9.142(a)(5). To conduct this review, "we view the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found

the existence of the elements of the crime beyond a reasonable doubt." Rodgers v. State, 948 So. 2d 655, 674 (Fla. 2006). In this case, competent, substantial evidence supports Carr's conviction. See Davis v. State, 2 So. 3d 952, 966-67 (Fla. 2008) ("In appeals where the death penalty has been imposed, this Court independently reviews the record to confirm that the jury's verdict is supported by competent, substantial evidence.").

As previously explained, Carr confessed to both police and Fulgham's sister that she and Fulgham carried out a plan to kill Strong, and when Strong's body was recovered, several points of Carr's confession were corroborated. Moreover, several witnesses testified to threats that Carr made against Strong's life the month before her murder. Accordingly, we conclude that there is sufficient evidence to support Carr's first-degree murder conviction.

## CONCLUSION

For the foregoing reasons, we affirm Carr's conviction for first-degree murder and her sentence of death.

It is so ordered.

LABARGA, C.J., and LEWIS, QUINCE, and PERRY, JJ., concur.
PARIENTE, J., concurs with an opinion.
POLSTON, J., concurs with an opinion, in which LABARGA, C.J., and CANADY, J., concur.
CANADY, J., concurs in the conviction and concurs in result only in the sentence.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring.

I concur with the majority opinion in affirming the conviction and death sentence. I write separately only to address Justice Polston's assertion in his concurring opinion that this Court should independently review the relative culpability of Carr and codefendant Joshua Fulgham to avoid "fractur[ing] our proportionality review." Concurring op. at 41 (Polston, J.).

I respectfully disagree. First, this Court could have avoided any "fracture" of our review of this issue by relinquishing jurisdiction to the trial court—a course I would have favored. However, because we did not do so, I agree with the majority in following our precedent to permit Carr to raise the issue in a timely filed postconviction motion. See Scott v. Dugger, 604 So. 2d 465, 468-69 (Fla. 1992) (explaining that a subsequent sentence of a codefendant constituted newly discovered evidence for purposes of a timely filed motion for postconviction relief).

A determination regarding relative culpability requires factual findings that this Court is not in a position to make in the first instance. See Puccio v. State, 701 So. 2d 858, 860 (Fla. 1997) ("A trial court's determination concerning the relative culpability of the co-perpetrators in a first-degree murder case is a finding of fact and will be sustained on review if supported by competent substantial evidence." (emphasis added)). Typically, this Court relies on the factual findings of the trial

- 38 -

court in reviewing relative culpability, but there are no factual findings by the trial court in this case as to Carr's culpability relative to Fulgham's.

Fulgham was convicted and sentenced to life imprisonment after Carr's direct appeal was already pending in this Court, and the issue was raised for the first time in Carr's reply brief. While the record in this case was later supplemented with the record from Fulgham's case, and while the parties filed supplemental briefs on the relative culpability issue, the State persuasively argued that this Court would be required to make factual findings in order to decide the issue of relative culpability under a de novo standard, as advocated for by Carr. See Supplemental Answer Br. of Appellee at 29-30, Carr v. State, No. 11-476 (Fla. Oct. 1, 2013).

This case involves a close jury vote, where a bare majority of seven jurors recommended that Carr be sentenced to death. Justice Polston's concurring opinion makes a facially compelling argument as to why Carr could be considered more culpable than Fulgham, relying on Carr's "superior intelligence" and testimony indicating that she was "manipulating of male relationships." Concurring op. at 41 (Polston, J.). My review of the record indicates, however, that the relative culpability issue is not as clear-cut as the concurrence asserts.

Specifically, as the majority opinion to some extent recounts and as Carr contended in supplemental briefing, the prosecution argued at both trials that each

respective codefendant was the manipulator and a dominant force in the murder. Although some evidence would support a finding that Carr was more culpable, other evidence suggests that Fulgham was more culpable. This evidence includes that Fulgham clearly had a strong motive for murdering his wife in order to prevent her from leaving the state with their children; Fulgham concocted the murder plan; Fulgham brought the victim to the crime scene; and Fulgham stated that he probably would not have been able to go through with the murder if the victim had not admitted to infidelity. In addition, it is disputed as to which of the two codefendants' inculpatory statements are more credible.

Without factual findings by the trial court, this Court is placed in the position of making its own factual determinations regarding all of these factors in the relative culpability analysis, which is actually what Carr asks this Court to do. See Supplemental Reply Br. of Appellant at 4, Carr v. State, No. 11-476 (Fla. Oct. 21, 2013) ("Since this Court does have the record of both proceedings below, this Court is in the unusual position of being able to conduct fact-finding."). In my view, it would be inappropriate for this Court to make factual determinations and, as an appellate court, we are ill-suited to do so. Accordingly, I concur with the majority in permitting the relative culpability claim to be resolved in postconviction proceedings.

POLSTON, J., concurring.

I concur with the majority's decision to affirm Carr's conviction and sentence. However, I write because the timing of Fulgham's sentence is no reason to fracture our proportionality review. Because we have all of the information necessary to decide Carr's culpability relative to Fulgham since the record was supplemented with Fulgham's record and the parties briefed the issue, we should decide the issue now on direct appeal rather than waiting for postconviction. See Wright v. State, 19 So. 3d 277, 305 (Fla. 2009) (considering codefendant's life sentence as part of our proportionality review on direct appeal despite the fact that the defendant was "tried and sentenced to death before [his codefendant's] trial commenced").

Though both Carr and Fulgham claim that the other suffocated Strong, Carr is nevertheless more culpable in her murder. Two examples are particularly telling. First, Carr's "superior intelligence" and IQ of 125 are a far cry from Fulgham's IQ of 81 and expert testimony that he has brain damage, is cognitively impaired, and "barely knows what's going to happen next." Second, in addition to presenting much weaker mitigation than Fulgham, the record establishes that Carr was the dominant force in Strong's murder. Specifically, Carr's own mental health expert testified that she is in control and manipulating of male relationships, and the trial court found no evidence that Fulgham dominated, manipulated, or

- 41 -

controlled Carr. In contrast, Fulgham's psychiatry expert testified that Fulgham has dependent personality disorder and said of Fulgham's relationship with Carr that, "when it really comes to what's going to happen, it comes back to what [Carr] wants." The same expert testified that, on the night of Strong's murder, Carr "stirr[ed] up conflict" by getting Strong to admit that she had been unfaithful to Fulgham during their marriage, and that the news of Strong's affair caused Fulgham to go through with her murder.

Therefore, in accordance with our precedent, I would consider Carr as more culpable than Fulgham in Strong's murder and affirm her death sentence as proportional on this additional basis. See Jennings v. State, 718 So. 2d 144, 153 (Fla. 1998) ("[D]isparate treatment of codefendants is permissible in situations where a particular defendant is more culpable.").

LABARGA, C.J., and CANADY, J., concur.

An Appeal from the Circuit Court in and for Marion County,
Willard Ira Pope, Judge - Case No. 422009CF001253BXXXXX

James S. Purdy, Public Defender, and Christopher Sinclair Quarles, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Sara Elizabeth Macks, Assistant Attorney General, Tampa, Florida,

for Appellee