# Supreme Court of Florida

_____

No. SC12-1350
_____

**TERENCE TOBIAS OLIVER,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[April 6, 2017]

PER CURIAM.

This case is before the Court on appeal from two convictions of first-degree murder and two sentences of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. Terence Tobias Oliver was convicted in Brevard County for the murders of Krystal Pinson and Andrea Richardson. Oliver now pursues the direct appeal of his convictions and sentences, which are subject to automatic review by this Court. For the reasons explained below, we affirm the trial court's judgments of conviction and sentences of death. We first set forth the facts of this case and then address Oliver's claims on direct appeal, which include the assertion that Oliver is entitled to relief under Hurst v. Florida (Hurst v. Florida), 136 S. Ct. 616

(2016). We conclude by evaluating the sufficiency of the evidence used to convict Oliver and the proportionality of Oliver's death sentences.

## FACTS

Oliver and Pinson had been dating since approximately December 2006. Although Oliver described his relationship with Pinson as a "side" relationship, the two lived together off and on during the span of their relationship. Sometime between late May and July 22, 2009, Oliver called Leander Watkins, his mechanic and a mutual friend of the couple, trying to get in touch with Pinson. Oliver was concerned Pinson was cooperating with the police regarding an outstanding warrant for his arrest for a prior crime in Volusia County. Oliver asked Watkins if he had seen Pinson, stating, "She's going to make me do something to her."

Oliver and Richardson had attended school together in Titusville. Growing up, Oliver would walk from school on the path next to Richardson's house. More recently, in 2009, Oliver purchased marijuana at Richardson's home, which was at the end of W.C. Stafford Street, near a cul de sac.

During the early morning hours of July 22, 2009, David Pouncey and Eric Edwards stood near the road on W.C. Stafford Street. Richardson's house was on the opposite side of the street, approximately six or seven houses down the street from Pouncey's house. Pouncey remembered seeing a person crossing the cul de sac at the end of the street, but he was not alarmed. Then, coming from the cul de

sac at the end of the street, he heard dogs barking and banging noises as if someone were banging a stick against a metal trashcan or knocking something against the door of Richardson's doghouse. Richardson was known to have numerous dogs in his yard, and at least one inside the house. The banging noises continued for approximately twenty to thirty seconds.

Two or three minutes later, Pouncey and Edwards noticed a person running from the direction of the cul de sac. A few seconds later, they noticed a second person walking in the same direction. The only physical characteristic Edwards could see was what appeared to be a pair of Timberland boots, worn by the second person. Pouncey recalls one of the individuals having dread-styled hair. Neither Pouncey nor Edwards could identify the individuals seen fleeing the area that night.

At approximately 2:25 a.m., as Edwards prepared to depart W.C. Stafford Street, Pouncey walked down to Richardson's home to check on him. Pouncey followed Edwards in calling out for Richardson, but he received no answer. Inside the house, Pouncey and Edwards discovered Richardson's body in a fetal position near the side door of the house. Pouncey nudged Richardson's body a few times before pushing him over and finding him covered in blood. Pouncey walked away from Richardson's body and called out for Pinson, whose car was parked outside.

Pinson had been staying with Richardson. As Pouncey walked out of the

dark master bedroom, he tripped over Pinson's body, which was positioned as if she had tried to get under the bed. Both men ran from the house. Pouncey and Edwards ran back to Pouncey's house and told a family member to call the police. Pouncey called Richardson's brother, William Davis, who also had been living at the residence where the victims were discovered. Davis arrived and entered the home approximately three to four minutes before the police arrived.

On the night of July 22, and the morning of July 23, 2009, Oliver visited Felicia Whaley—his former roommate—and her boyfriend in Satellite Beach. Oliver slept in Whaley's guest bedroom. The next afternoon, Whaley was notified of the murders of Richardson and Pinson. Whaley woke Oliver and told him to get ready to leave because she had to go to work and needed time to take Oliver wherever he needed to go. When Whaley woke Oliver, he seemed "normal." After Oliver finished a phone call, Whaley noticed that Oliver was crying. Oliver asked Whaley to drop him off at a Walgreens store in Melbourne so he could meet with some friends. Whaley noticed a vehicle containing two women who were there to meet Oliver.

The two women were Sheena Camiscioli and Chelsea Wilson, who arrived in Camiscioli's Ford Explorer. Oliver got into the back seat of the vehicle. He did not have any items with him at the time. Camiscioli drove and Oliver instructed her where to go. After dropping Wilson off at a friend's house, Camiscioli drove

- 4 -

Oliver to a duplex where Oliver's mother's truck was backed into the yard. At the duplex, Camiscioli stayed in the Explorer while Oliver went into the house. Oliver returned with baskets of clothes and shoes, which he put into the back of the Explorer. Oliver got into the passenger seat and the two then went back to pick up Wilson.

Camiscioli then drove to a house in Cocoa. When they arrived, Oliver retrieved a shotgun from the back of Camiscioli's Explorer and entered the house. Thereafter, he exited the house with a handgun that he put into the backseat with Wilson. When Wilson appeared to be afraid of the weapon, Oliver wrapped it in a bag. While at the house in Cocoa, Oliver asked Camiscioli if he could drive. With Camiscioli in the passenger seat and Wilson in the back seat, Oliver drove to a lake inside of an apartment complex, slowed the car down, and threw the gun out of the driver's side window into the lake. Camiscioli asked him why he threw the gun out of the window but Oliver did not respond.

They then drove to a Motel 6 in Cocoa, where Camiscioli rented a motel room for Oliver for the weekend because Oliver did not have identification. Camiscioli and Wilson returned to Titusville for the evening. The police contacted Camiscioli that night looking for Oliver, but she told them she did not know where he was. The next afternoon, Camiscioli and Wilson returned to the Motel 6. When

- 5 -

Camiscioli saw Oliver that day, he was wearing a braided wig. Oliver barely spoke to them.

Camiscioli was curious as to why Oliver was being distant so she walked up to his room, alone. Oliver was sitting on the bed in the hotel room. When Camiscioli asked him if he was okay, considering Pinson's recent death, Oliver began to cry. Oliver told Camiscioli that Pinson "was on a lot of his paperwork and he was tired." Camiscioli recalled that Oliver began to cry even more when he "mentioned that he was tired of the domestic violence and [Pinson] always calling the police on him." While crying, Oliver told Camiscioli that he killed Pinson in Richardson's bed, and he shot Richardson because Richardson was there and was running out of the back door. Oliver told Camiscioli that law enforcement was looking for him about the murders, but he was not concerned because Richardson sold drugs at the house so the murders would look like the result of a robbery. Oliver also told Camiscioli he did not know why the police thought he did it and that there was no evidence that he did it. The conversation ended when Camiscioli turned and left the room. She did not contact the police because, based on what Oliver had just told her, she was afraid. However, she did tell Wilson.

The next day, the police came to the Motel 6 looking for Oliver. Camiscioli and Wilson drove to the police station to give a statement. At the police station,

Camiscioli contacted Tyrrell Oliver—her boyfriend and Oliver's brother—and notified him that Oliver confessed to her and she was a witness in the case.

On July 28, 2009, Oliver contacted Watkins stating he needed some money. Watkins contacted law enforcement to report Oliver's whereabouts. While still in contact with law enforcement, Watkins agreed to wire the money to a supermarket in Cocoa and when Oliver arrived, he was arrested. He was wearing a dread-styled wig at the time.

The next day, Camiscioli directed law enforcement to the lake where Oliver had disposed of the murder weapon. The Brevard County Sheriff's Office Dive Team retrieved a .40 caliber firearm and magazine, wrapped in the same packaging that Wilson and Camiscioli had previously observed. On July 30, 2009, police went to the residence in Cocoa and recovered the shotgun that Oliver had taken there. Oliver admitted to having possessed the shotgun.

**Medical Examiner Testimony**

At trial, the cause of Richardson's death was determined to be multiple gunshot wounds to his torso and extremities. The medical examiner identified three entry wounds and multiple reentry wounds. Richardson was shot in the right shoulder and lower right chest and had a graze wound to his scalp on the left side of his forehead. The medical examiner also stated that two of the bullets found could have possibly reentered Richardson's body through his left elbow and left

wrist. All three shots were fired from at least three feet away. He could not determine the order of the shots.

The cause of Pinson's death was multiple gunshot wounds to her torso and extremities. The medical examiner identified eight gunshot wounds to Pinson's body. The bullets entered her body through her chest, right arm, mid-back, left lower back, right buttocks, and left foot. The order of the shots could not be determined. At least three of the shots were fired from within three to four feet. Pinson also had minor abrasions below her chin and above her right knee and a superficial cut over her left knee. Pinson also had a "very superficial" ankle injury. The medical examiner stated that none of Pinson's injuries would have resulted in her losing consciousness instantaneously. The medical examiner could not determine how long it took before Pinson actually died. He only indicated that it could have taken "seconds to minutes." The medical examiner stated that, even if Pinson were asleep, she would still have felt pain until she lost consciousness and that, once Pinson lost consciousness, she would not have regained it.

Winchester .40 caliber shell casings were located near Richardson's and Pinson's bodies. There were two bullet holes in the bed sheet and the mattress, one at the top and one in the middle. There was also a bullet hole in the box spring and another underneath a sofa bed in the same bedroom. There were no signs of forced entry into the home. The .40 caliber Smith and Wesson High Point model pistol

used in the murders holds eleven bullets, ten in the magazine, and one in the chamber. As long as there is a bullet in the chamber or the magazine, the gun can continuously be fired without being reloaded. All of the shell casings and all of the bullets in evidence were fired from this gun.

On March 16, 2012, the jury found Oliver guilty of first-degree murder for the killings of Pinson and Richardson. The jury also found Oliver guilty of armed burglary of a dwelling with discharge of a firearm causing death. The trial court additionally found Oliver guilty of possession of a firearm by a convicted felon. The trial court sentenced Oliver to death on both counts of first-degree murder. Oliver was sentenced to life without parole on the burglary charge. On the charge of possession of a firearm by a convicted felon, Oliver was sentenced to five years in prison. On June 15, 2012, the trial court followed the jury's unanimous recommendation and imposed two death sentences for the first-degree murder convictions.

## ISSUES ON APPEAL

On appeal, Oliver raises four issues, which we address in turn: (1) the trial court abused its discretion in admitting testimony regarding a shotgun that was not used to commit the killings and allowing the shotgun to be published to the jury; (2) the trial court erred in denying defendant's motion for mistrial where the prosecutor argued lack of remorse; (3) the trial court erred in finding that the

murder of Richardson was committed in a cold, calculated, and premeditated manner; and (4) Florida's death sentencing scheme is unconstitutional pursuant to Ring v. Arizona, 536 U.S. 584 (2002).

**Introduction of the Shotgun**

As his first claim, Oliver argues that the trial court abused its discretion in admitting testimony regarding the shotgun and in allowing the shotgun to be published to the jury when it indisputably was not the murder weapon. We disagree.

One day after the murders, Oliver had Camiscioli drive him to his truck, which was parked at a cousin's house. Oliver retrieved the shotgun from his truck and concealed it under clothes in a laundry basket. Oliver and Camiscioli then picked up Chelsea Wilson, and the three of them drove to Oliver's friend's house where Oliver exchanged the shotgun for the weapon used in the murders of Pinson and Richardson: a .40-caliber semi-automatic handgun. Oliver then drove Camiscioli and Wilson to an apartment complex where he threw the handgun into a lake. The handgun was later retrieved from the lake, and ballistics experts determined that it was the gun that fired the bullets that killed Pinson and Richardson.

At trial, Oliver's objections to testimony relating to the shotgun and to the shotgun being received into evidence were overruled. The trial court found the

shotgun "relevant and material." Both Camiscioli and Wilson testified that Oliver brought the shotgun to the friend, the friend gave Oliver the handgun, and Oliver then threw the handgun into the lake. There was also testimony that the shotgun was recovered from the friend's house during the execution of a search warrant. It was sent for DNA analysis and a mixture of DNA from at least two people was found on the stock and trigger. A partial DNA profile of the major contributor to the mixture was developed, which was consistent with Oliver's known DNA profile, and he could not be excluded as the source of the DNA on the shotgun. Oliver also testified about the shotgun. He admitted that he retrieved the shotgun from his truck, that it was his DNA on the gun, and that he took the shotgun to the friend's house, but he denied receiving a handgun from the friend and denied ever having thrown a handgun into a lake.

The prerequisite to the admissibility of evidence is relevancy. Wright v. State, 19 So. 3d 277, 291 (Fla. 2009). "The concept of 'relevancy' has historically referred to whether the evidence has any logical tendency to prove or disprove a fact. If the evidence is logically probative, it is relevant and admissible unless there is a reason for not allowing the jury to consider it." State v. Taylor, 648 So. 2d 701, 704 (Fla. 1995) (quoting Charles W. Ehrhardt, Florida Evidence § 401.1, at 95-96 (1994)). All evidence tending to prove or disprove a material fact is admissible, unless precluded by law. See §§ 90.401-90.402, Fla. Stat. (2009).

However, even "[r]elevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat. (2009).

"Evidence that a suspected person in any manner endeavors to evade a threatened prosecution by any ex post facto indication of a desire to evade prosecution is admissible against the accused where the relevance of such evidence is based on consciousness of guilt inferred from such actions." Heath v. State, 648 So. 2d 660, 664 (Fla. 1994) (citing Sireci v. State, 399 So. 2d 964, 968 (Fla. 1981), overruled on other grounds by Pope v. State, 441 So. 2d 1073, 1077-78 (Fla. 1983)). Furthermore, "the State is entitled to present evidence which paints an accurate picture of the events surrounding the crimes charged." Gosciminski v. State, 132 So. 3d 678, 694 (Fla. 2013) (quoting Griffin v. State, 639 So. 2d 966, 970 (Fla. 1994)).

Oliver's possession and attempt to dispose of the murder weapon within a day after the murders was clearly relevant to link Oliver to the weapon and to support an inference of consciousness of guilt. And evidence regarding the circumstances under which Oliver obtained the murder weapon was relevant to prove that Oliver did not come into possession of the murder weapon by happenstance. After learning that he was a suspect in the murders, Oliver

- 12 -

deliberately made a trip to retrieve the shotgun from his car, and another trip to trade it for the murder weapon, which he promptly tossed into a lake. Evidence that Oliver intentionally obtained the murder weapon, and was willing to trade something of value for it, was necessary to paint a complete and accurate picture of his attempt to destroy evidence that could link him to the murders.

The probative value of the shotgun is clear: it connected Oliver to the murder weapon within a day of the murders. It was introduced as a link in the chain to prove Oliver's identity as the murderer, not to suggest generally that Oliver was a dangerous person or that he must be guilty of the shooting deaths of the victims because he regularly possessed firearms. The fact that he was in possession of the murder weapon shortly after the murders was what suggested that Oliver was the murderer. The shotgun merely showed how Oliver deliberately obtained the murder weapon before throwing it into the lake.

If there was any prejudice to Oliver by the fact that the object he traded for the murder weapon also happened to be a firearm, it was minimal. The jury was not aware that Oliver was a convicted felon when evidence of the shotgun was introduced, and it is not a crime to merely possess a firearm. Further, by the time the shotgun was mentioned during the trial, the jury had already heard that Oliver possessed the handgun during the murders and again when he threw it into the lake. The evidence that he possessed the murder weapon was highly prejudicial;

the fact that he later possessed a shotgun would have done little to add that prejudice. And if the shotgun did prejudice Oliver, it certainly was not "unfair" prejudice. The shotgun was simply necessary to paint an accurate picture of the events surrounding the crimes charged, not to improperly inflame the jury.

For these reasons, we find that the evidence regarding the shotgun was relevant, it did not present a risk of confusing or misleading the jury, and that the probative value of the shotgun evidence was not substantially outweighed by the danger of unfair prejudice. Accordingly, the trial court did not abuse its discretion in allowing testimony about the shotgun or its admission into evidence.

**Denial of Motion for Mistrial**

Next, Oliver argues the trial court erred in denying his motion for a mistrial when the prosecutor argued lack of remorse. We disagree and affirm the trial court's denial of relief. "A motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial." Silvia v. State, 60 So. 3d 959, 976 (Fla. 2011) (citing England v. State, 940 So. 2d 389, 401-02 (Fla. 2006)). In Pope, 441 So. 2d at 1078, this Court decided that "lack of remorse is not an aggravating factor" and that "lack of remorse should have no place in the consideration of aggravating factors." However, this Court has determined that evidence of lack of remorse is admissible to rebut proposed mitigation, such as remorse and rehabilitation. See Tanzi v. State, 964 So. 2d 106, 114-15 (Fla. 2007)

- 14 -

(holding that the trial court did not abuse its discretion in allowing the State's questions regarding lack of remorse where defendant's mitigation witness opened the door to the line of questioning and where it is clear that the State used lack of remorse to rebut the proposed mitigator of bipolar disorder, not to establish an aggravator); Singleton v. State, 783 So. 2d 970, 978 (Fla. 2001) (holding "that lack of remorse is admissible to rebut evidence of remorse or other mitigation such as rehabilitation"); cf. Derrick v. State, 581 So. 2d 31, 36 (Fla. 1991) (finding that although lack of remorse is permitted to rebut evidence of remorse or rehabilitation, the trial court erred in permitting the State to present evidence of lack of remorse before the defense presented any testimony).

During closing argument, the prosecutor made the following statement:

PROSECUTOR: The last one doesn't - - that they're going to give you hasn't been shown in this case at all . . . [t]he capital felony was committed while the defendant was under the influence of an emotional disturbance, you're going to be asked to look to determine if there's any evidence of that. Really? . . . Frankly, you have to speculate about what he was crying about and if he's crying about the fact that the law is now after him and he's woe is me because I've got myself into this and they may catch me, then I would suggest that deserves no mitigation. <u>And if he's crying genuinely feeling remorse for the crimes that he's committed, then you need to weigh that and you need to give that the weight that you think is appropriate, but I caution you to recall that he testified in this case and there's not been demonstration of remorse in this case by him.</u>

Defense counsel objected and moved for a mistrial, stating that the prosecutor had improperly argued lack of remorse where the defense had not raised

- 15 -

remorse as a mitigating circumstance.  The prosecutor gave the following

explanation:

> PROSECUTOR:  Well, that's not the context that I'm offering it.  <u>I'm offering it as remorse as mitigation which I believe - - the only emotional disturbance that's in evidence during this case is him crying in front of Miss Whaley and him crying in front of Sheena Camiscioli. I don't know what other emotional disturbance evidence there is in this case and I have to deal with what they're offering.</u>  I don't get to speak again and <u>I'm not offering this in the context of an aggravator, far from it, I'm trying to demonstrate there's no mitigation relating to any emotional disturbance that has been demonstrated by this defendant associated with the crime in this trial.</u>

Without ruling on the objection, the trial court denied the motion for

mistrial.

This Court has repeatedly explained, where, as here, counsel lodges a

contemporaneous objection to an improper comment and moves for mistrial

without obtaining a ruling on the objection to an improper comment, "the standard

of review on direct appeal is whether the trial court abused its discretion in denying

the motion for mistrial, <u>not</u> the harmless error standard which applies when an

objection is overruled." <u>Bright v. State</u>, 90 So. 3d 249, 259 (Fla. 2012) (citing

<u>Poole v. State</u>, 997 So. 2d 382, 391 n.3 (Fla. 2008), and <u>Dessaure v. State</u>, 891 So.

2d 455, 465 n.5 (Fla. 2004)); <u>accord</u> <u>Delhall v. State</u>, 95 So. 3d 134, 169 (Fla.

2012); <u>Kilgore v. State</u>, 55 So. 3d 487, 513 (Fla. 2010).

In the instant case, the State's comment was couched in a plea for the jury to

determine why the defendant was crying.  However, the defense had made no

specific argument that the crying was an indication of remorse. In fact, the defendant maintained his innocence, even during the final stages of the trial. Additionally, in light of the brevity of the reference, the jury's unanimous recommendation for a death sentence and the weighty aggravation referenced in the sentencing order, there is no reasonable possibility that this single comment affected the verdict. Therefore, the trial court did not abuse its discretion in denying the motion for mistrial.

## CCP as to Andrea Richardson

Oliver concedes that the evidence supports the trial court's finding that the killing of Pinson was committed in a cold, calculated and premeditated manner, without any pretense of moral or legal justification (CCP). However, he disputes the trial court's CCP finding as to the killing of Richardson. We find that there is competent, substantial evidence to support the trial court's finding of the CCP aggravator as to the murder of Richardson.

The evidence presented at trial established that Oliver and Krystal Pinson ended a two-and-a-half year relationship the month prior to the murders. Their relationship was marked by incidents of domestic violence, which Pinson reported to law enforcement. When the relationship ended in June 2009, Oliver had an outstanding warrant for an unrelated felony in Volusia County. He went to stay with relatives in Brevard County, hoping that he would not be recognized and

arrested on the Volusia County warrant. But in the weeks leading up to the murders, Oliver became concerned that Pinson was assisting law enforcement in their efforts to locate and apprehend him. Oliver expressed his concerns to Watkins, and told Watkins that Pinson's actions were "going to make [him] do something to her."

At around 5 p.m. on July 21, 2009, Oliver was seen driving approximately one mile away from Richardson's house, wearing a wig with dreadlocks to hide his identity. At approximately 1 a.m. on July 22, 2009, Oliver entered Richardson's home, armed with a .40-caliber semi-automatic handgun. He found Pinson in Richardson's bed and shot her eight times. As Richardson attempted to dress himself and escape through a side door, Oliver shot him three times. Oliver then staged the scene to make it look like the shootings occurred during a drug-related robbery before fleeing from the house and the neighborhood down a secluded path. He later admitted to Camiscioli that he killed Pinson because she "was on a lot of his paperwork and he was tired . . . of the domestic violence and her always calling the police on him." Oliver said he "had to shoot [Richardson] because he was there and he was running out of the back door."

"[T]he focus of the CCP aggravator is the manner of the killing, not the target." Doorbal v. State, 837 So. 2d 940, 961 (Fla. 2003) (quoting Bell v. State, 699 So. 2d 674, 678 (Fla. 1997)). It is well settled that the heightened

premeditation necessary for CCP does not have to be directed toward the specific victim. E.g., Diaz v. State, 860 So. 2d 960, 969 (Fla. 2003); Howell v. State, 707 So. 2d 674, 682 (Fla. 1998); Bell, 699 So. 2d at 677-78; Sweet v. State, 624 So. 2d 1138, 1142 (Fla. 1993); Provenzano v. State, 497 So. 2d 1177, 1183 (Fla. 1986). Oliver broke into Richardson's home in the middle of the night with a loaded .40-caliber handgun and the intent to kill, and he shot Richardson as Richardson attempted to flee. On these facts, we uphold the trial court's finding that the CCP aggravator was applicable to Richardson's murder.

### Hurst v. Florida

While Oliver's appeal was pending, the United States Supreme Court issued its decision in Hurst v. Florida, in which it held that Florida's capital sentencing scheme violated the Sixth Amendment to the United States Constitution. Hurst v. Florida, 136 S. Ct. at 619. The Supreme Court concluded that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." Id. The Supreme Court also made clear that "[t]he analysis the Ring Court applied to Arizona's sentencing scheme applies equally to Florida's." Id. at 621. As a result, we granted supplemental briefing to address the impact of Hurst v. Florida on Oliver's sentence.

- 19 -

On remand from the United States Supreme Court, in <u>Hurst v. State</u> (<u>Hurst</u>), 202 So. 3d 40 (Fla. 2016), <u>petition for cert. filed</u>, No. 16-998 (U.S. Feb. 13, 2017), we held that "the Supreme Court's decision in <u>Hurst v. Florida</u> requires that all the critical findings necessary before the trial court may consider imposing a sentence of death must be found unanimously by the jury." 202 So. 3d at 44. We explained:

> In capital cases in Florida, these specific findings required to be made by the jury include the existence of each aggravating factor that has been proven beyond a reasonable doubt, the finding that the aggravating factors are sufficient, and the finding that the aggravating factors outweigh the mitigating circumstances.

<u>Id.</u> We further held, based on Florida's separate right to trial by jury under article I, section 22, of the Florida Constitution, "Florida's requirement for unanimity in jury verdicts, and under the Eighth Amendment to the United States Constitution, that in order for the trial court to impose a sentence of death, the jury's recommended sentence of death must be unanimous." <u>Id.</u> Finally, we determined that <u>Hurst v. Florida</u> error is capable of harmless error review. <u>Id.</u> at 68. Thus, the issue here is whether any <u>Hurst</u> error during Oliver's penalty phase proceedings was harmless beyond a reasonable doubt.

In <u>Hurst</u>, we explained the standard for evaluating whether such error is harmless beyond a reasonable doubt. <u>Id.</u> ("The question is whether there is a reasonable possibility that the error affected the [sentence]." (quoting <u>State v.</u>

- 20 -

DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986))). Put simply, as we stated in Davis

v. State, "As applied to the right to a jury trial with regard to the facts necessary to

impose the death penalty, it must be clear beyond a reasonable doubt that a rational

jury would have unanimously found that there were sufficient aggravating factors

that outweighed the mitigating circumstances." 207 So. 3d 142, 174 (Fla. 2016);

accord Hurst, 202 So. 3d at 68.

Turning to Oliver's sentence, we emphasize the penalty phase jury's

unanimous recommendation for a sentence of death. As we stated in Davis:

> Th[is] recommendation[] allow[s] us to conclude beyond a reasonable
> doubt that a rational jury would have unanimously found that there
> were sufficient aggravators to outweigh the mitigating factors. The
> instructions that were given informed the jury that it needed to
> determine whether sufficient aggravators existed and whether the
> aggravation outweighed the mitigation before it could recommend a
> sentence of death. . . . The jury was presented with evidence of
> mitigating circumstances and was properly informed that it may
> consider mitigating circumstances that are proven by the greater
> weight of the evidence. . . .
>     Even though the jury was not informed that the finding that
> sufficient aggravating [factors] outweighed the mitigating
> circumstances must be unanimous, and even though it was instructed
> that it was not required to recommend death even if the aggravators
> outweighed the mitigators, the jury did, in fact, unanimously
> recommend death. . . . From these instructions, we can conclude that
> the jury unanimously made the requisite factual findings to impose
> death before it issued the unanimous recommendations.

207 So. 3d at 174-75.

Thus, we conclude that the State has sustained its burden of demonstrating

that any Hurst error in Oliver's penalty phase was harmless beyond a reasonable

- 21 -

doubt.  The jury unanimously found all of the necessary facts for the imposition of death sentences by virtue of its unanimous recommendation.  In fact, although the jury was informed that it was not required to recommend death unanimously, and despite the mitigation presented, the jury still unanimously recommended that Oliver be sentenced to death for the murders of Pinson and Richardson.  The unanimous recommendation in this case is precisely what we determined in Hurst to be constitutionally necessary to impose a sentence of death under Florida's separate constitutional right to trial by jury.  Art. I, § 22, Fla. Const.  Accordingly, Oliver is not entitled to a new penalty phase.

## Sufficiency of the Evidence

In death penalty cases, regardless of whether the appellant raises the issue, this Court must conduct an independent review to determine whether sufficient evidence exists to support a first-degree murder conviction.  See Fla. R. App. P. 9.142(a)(5); Phillips v. State, 39 So. 3d 296, 308 (Fla. 2010).  The evidence in a capital case is judged to be sufficient when it is both competent and substantial.  See Phillips, 39 So. 3d at 308.  In conducting its review, this Court "view[s] the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt."  Rodgers v. State, 948 So. 2d 655, 674 (Fla. 2006) (quoting Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)).  Further, "[a] general guilty

verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation." Crain v. State, 894 So. 2d 59, 73 (Fla. 2004).

Oliver was charged with two counts of first-degree murder, in violation of section 782.04(1)(a), Florida Statutes (2009); one count of armed burglary of a dwelling while inflicting death, in violation of section 810.02(2)(b), Florida Statutes (2009); and one count of possession of a firearm by a convicted felon, in violation of section 790.23, Florida Statutes (2009). The jury was instructed on both first-degree premeditated murder and first-degree felony murder. The jury returned a general verdict in favor of first-degree murder. Thus, the conviction should be sustained where the evidence is sufficient to support either form of the offense.

First, there is sufficient evidence in this case to support a conviction for first-degree premeditated murder.

> Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.

Bradley, 787 So. 2d at 738 (quoting Woods v. State, 733 So. 2d 980, 985 (Fla. 1999)). Premeditation may be inferred from such facts as "the nature of the weapon used, the presence or absence of adequate provocation, previous

difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." Id. (quoting Norton v. State, 709 So. 2d 87, 92 (Fla. 1997)).

The State produced direct evidence from Camiscioli that Oliver confessed to killing Pinson and Richardson, revealed to Camiscioli that he killed Pinson in Richardson's bed, and explained that he killed Richardson because he was there and trying to run out of the house. The physical evidence at the scene corroborated this testimony, where Pinson was found shot to death in the bedroom, and Richardson was found shot to death close to the exit of the home. Watkins testified that Oliver was attempting to contact Pinson prior to the murder, and threatened to "do something to her," if she continued to cooperate with police regarding a warrant that he had pending in a different county. Based on this evidence, the jury could have found that Oliver had a fully formed conscious purpose to kill at the time of the homicides. Accordingly, there was sufficient evidence that Oliver committed the homicide with "a premeditated design to effect the death of the person killed[.]" See § 782.04(1)(a)(1), Fla. Stat. (2009).

Second, Oliver was contemporaneously convicted of armed burglary of a dwelling with discharge of a firearm causing death. This is a qualifying felony to support a conviction for first-degree felony murder. See § 782.04(1)(a)(2)(e), Fla. Stat. (2009). Section 810.02(1)(a), Florida Statutes, defines burglary as "entering

- 24 -

or remaining in a dwelling, a structure, or a conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter."

The State's evidence proves that Oliver entered Richardson's home without permission in order to kill Pinson, and that Oliver killed both Pinson and Richardson. As previously stated, Camiscioli testified that Oliver admitted to entering Richardson's home and murdering both victims. Additionally, the State provided direct evidence from a retired crime scene technician for the Titusville Police Department, who found Winchester .40 caliber shell casings located near Richardson's and Pinson's bodies.

Camiscioli and Wilson testified that they observed the defendant dispose of the murder weapon in the days following the murders. The Winchester .40 caliber weapon was found where Camiscioli and Wilson had witnessed Oliver dispose of it in the same packaging that they had previously witnessed Oliver place it in. The State provided evidence that Oliver was observed in close proximity to Richardson's home just days before the murders and was wearing a dread-styled wig. Pouncey, who apparently observed the assailants fleeing the scene of the murders, recalled that one of the assailants had dread-styled hair. Therefore, Oliver's conviction for first-degree murder is supported by competent, substantial evidence.

**Proportionality**

Although Oliver does not challenge the proportionality of his death sentence, this Court has an independent obligation to conduct a proportionality analysis. See Miller v. State, 42 So. 3d 204, 229 (Fla. 2010); see also Fla. R. App. P. 9.142(a)(5). "[T]o ensure uniformity in death penalty proceedings, 'we make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.' " Floyd v. State, 913 So. 2d 564, 578 (Fla. 2005) (quoting Anderson v. State, 841 So. 2d 390, 407-08 (Fla. 2003)). Our review involves " 'a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances.' " Tillman v. State, 591 So. 2d 167, 169 (Fla. 1991) (quoting Porter v. State, 564 So. 2d 1060, 1064 (Fla. 1990) (emphasis omitted)).

In this case, the trial court found four aggravators applicable to the killings of both victims: (1) the defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to a person, which included a 1995 robbery with a firearm or deadly weapon, a 2002 conviction for resisting arrest with violence, and the contemporaneous first-degree murders of Pinson and Richardson (great weight); (2) the capital felony was committed while

- 26 -

the defendant was engaged in a burglary (great weight); (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest (great weight); and (4) the murders were committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification (great weight).

The trial court found that five nonstatutory mitigators were proven: (1) the defendant completed high school (no weight); (2) the defendant attempted to further his education by attending Le Cordon Bleu Culinary Academy (little weight); (3) the defendant attempted to further his education by attending Daytona Beach State College (little weight); (4) the defendant grew up in a household with both parents present (some weight); and (5) the existence of any other factors in the defendant's background that would mitigate against imposition of the death penalty (Oliver's church activity) (some weight).

This Court has affirmed a sentence of death in cases involving less aggravating and more mitigating circumstances. In Blackwood v. State, 777 So. 2d 399 (Fla. 2000), the defendant was convicted of strangling his former girlfriend to death. Id. at 403. The trial court found only the HAC aggravating circumstance. Id. at 405. The trial court found one statutory mitigator (no significant history of prior criminal conduct), which it gave "significant weight," and eight nonstatutory mitigators: (1) emotional disturbance at the time of the crime (moderate weight); (2) capacity for rehabilitation (very little weight); (3) cooperation with police

- 27 -

(moderate weight); (4) murder resulted from lover's quarrel (no specific weight given but considered this factor to the extent that the killing was borne out of a prior relationship and was fueled by passion); (5) remorse (some weight); (6) appellant is a good parent (some weight); (7) appellant's employment record (some weight); and (8) appellant's low intelligence level (some weight). Id. In finding the defendant's death sentence proportional, this Court determined that the trial court's determination that the one aggravator outweighed all of the mitigation in the case was supported by competent, substantial evidence. Id. at 412-13.

In Oliver's case, we find four aggravators applicable to one death and three applicable to the other death, with the trial court assigning all of them "great weight." Further, the trial court gave Oliver's five nonstatutory mitigators "no weight" to "some weight." See, e.g., Mansfield v. State, 758 So. 2d 636, 642, 647 (Fla. 2000) (death sentence was proportionate where trial court found two aggravating factors, HAC and murder committed during sexual battery, measured against five nonstatutory mitigating factors that were given little weight); Davis v. State, 703 So. 2d 1055, 1061-62 (Fla. 1997) (death sentence was proportionate where trial court found two aggravating factors of HAC and committed during course of sexual battery outweighed slight nonstatutory mitigation); Geralds v. State, 674 So. 2d 96, 98, 105 (Fla. 1996) (death sentence was proportionate where trial court found three aggravating circumstances, HAC, CCP, and murder in

- 28 -

course of felony, and some nonstatutory mitigation). In comparison to other cases where this Court has upheld the death penalty, Oliver's death sentence is proportionate.

**CONCLUSION**

For the reasons stated above, we affirm Oliver's convictions and death sentence.

It is so ordered.

LABARGA, C.J., and LEWIS, J., concur.
PARIENTE, J., concurs in result.
QUINCE, J., concurs in part and dissents in part with an opinion.
CANADY, POLSTON, and LAWSON, JJ., concur as to the conviction and concur in result as to the sentence.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

QUINCE, J., concurring in part and dissenting in part.

I concur with my colleagues that Oliver is not entitled to relief on the majority of his claims. However, I disagree with the analysis set forth by the majority in denying Oliver's claims that the trial court (1) abused its discretion in admitting testimony regarding a shotgun that was not used to commit the killings and allowing the shotgun to be published to the jury and (2) erred in finding that the murder of Richardson was committed in a cold, calculated, and premeditated manner. I would also find that Oliver is entitled to a new penalty phase under Hurst.

- 29 -

**Introduction of the Shotgun**

First, I do not agree that the trial court did not abuse its discretion in admitting testimony regarding the shotgun and in allowing the shotgun to be published to the jury when it indisputably was not the murder weapon. Although the shotgun was relevant to the timeline of events surrounding the crime, it was not relevant to a material issue in dispute at the time it was allowed. Despite this, the error in admitting the shotgun is harmless.

Harmless Error

Once error has been established, the inquiry is "whether there is a reasonable possibility that the error affected the verdict." State v. DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986). This burden remains on the State. Id. at 1135. This analysis requires this Court to consider both "the permissible evidence on which the jury could have legitimately relied" and "the impermissible evidence which might have possibly influenced the jury verdict." Id. In determining that an error is harmless, an appellate court must find beyond a reasonable doubt that the error did not contribute to the verdict. Id.

In light of the other evidence that the jury could have relied on that connects Oliver to the murders, there is no reasonable possibility that the erroneous admission of the shotgun evidence affected the verdict. The jury heard testimony from Watkins, who described the contentious relationship between Oliver and

Pinson. Watkins also stated that Oliver wanted to speak to Pinson prior to the killings because he was concerned that Pinson was cooperating with the police in connection with a pending warrant in a different county. In addition, Watkins recalled Oliver threatening to "do something" to Pinson, prior to the murders. Camiscioli testified that Oliver confessed to the killings and told her the motive for the killings and the manner they were carried out, which coincides with the physical evidence obtained from the scene. Oliver also told Camiscioli that he did not expect to get caught because the police would assume that the killings were part of a robbery. Pouncey testified that when he walked into the master bedroom, he could see all of the dresser drawers pulled out. Both Camiscioli and Wilson told the jury about when and where they observed the defendant dispose of, what later turned out to be, the murder weapon.

Testimony regarding the shotgun was used to provide the jury with a timeline of the events following the murder. However, the direct evidence of guilt against Oliver would have reasonably persuaded the jury to find Oliver guilty of both murders, despite any error in the introduction of the shotgun testimony. Therefore, any error in admitting testimony regarding the shotgun is harmless.

## Feature of the Trial

Oliver claims that the shotgun improperly became a feature of the trial, as the trial court allowed numerous witnesses to testify regarding his possession of

- 31 -

the shotgun before it was ultimately entered into evidence. To determine whether evidence of collateral bad acts or wrongs became a feature of a trial, this Court does not solely measure the number of references that the prosecution made to such evidence. Wright v. State, 19 So. 3d 277, 293 (Fla. 2009). However, numerous references to prior bad acts by the defendant "may indicate a prohibited transgression, even if it is not the sole determining factor." Id. Evaluating the purpose for which the State references the evidence of prior bad acts in its closing argument may also assist in determining whether the evidence was a feature of the trial. Id. at 294.

The shotgun being displayed to the jury did not become a feature of the trial. Of the seventeen witnesses that testified for the State, six of them mentioned the shotgun. None of those witnesses provided voluminous testimony regarding the shotgun. Both Camiscioli and Wilson briefly testified that they saw Oliver in possession of the shotgun immediately prior to possessing the murder weapon. One detective testified that the shotgun was recovered from the same home in Cocoa, where Wilson and Camiscioli had reported the murder weapon was retrieved. A crime scene technician, crime scene analyst, and retired officer testified regarding the process of collecting Oliver's DNA, and the fact that he could not be excluded as contributing to the DNA found on the shotgun.

The State mentioned the shotgun three times in its guilt phase closing argument. One reference purported to illustrate the limited amount of discrepancies between Oliver's timeline surrounding the shotgun and that of Camiscioli and Wilson. The other two references to the shotgun were to acknowledge that Oliver admitted to possessing the shotgun. The evidence relating to the shotgun did not "outweigh the evidence directly relating to the crime charged." See Snowden v. State, 537 So. 2d 1383, 1386 (Fla. 3d DCA 1989). Therefore, it does not appear that these references were so voluminous as to consider the shotgun a feature of the trial.

**CCP as to Andrea Richardson**

Second, the trial court's finding of CCP as to the killing of Richardson is not supported by competent, substantial evidence in the record. But that error is harmless. "When this Court strikes an aggravating factor on appeal, 'the harmless error test is applied to determine whether there is no reasonable possibility that the error affected the sentence.' " Turner v. State, 37 So. 3d 212, 226 (Fla. 2010) (quoting Jennings v. State, 782 So. 2d 853, 863 n.9 (Fla. 2001)).

In this case, the trial court found four aggravating circumstances applicable to both deaths: (1) the defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to a person; (2) the capital felony was committed while the defendant was engaged in a burglary; (3) the

- 33 -

capital felony was committed for the purpose of avoiding or preventing a lawful arrest; and (4) the murders were committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification. The trial court gave all of these aggravators great weight. Further, the trial court gave Oliver's five nonstatutory mitigators "little" to "some" weight. In light of the weight of the aggravation against the mitigation, there is no reasonable possibility that the trial court's decision to follow the unanimous jury verdict and sentence Oliver to death would have been affected if the trial court had not found the CCP aggravator as to the killing of Richardson.

## **Hurst v. Florida**

Finally, I cannot agree with the majority's conclusion that the Hurst error in this case is harmless beyond a reasonable doubt. Because I would find that the Hurst error in this case requires a new penalty phase, I dissent.

In Hurst, 202 So. 3d at 69, we declined to speculate why the jurors voted the way they did; yet, here, the majority finds that the unanimous "recommendation allows us to conclude beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravators to outweigh the mitigating factors." Majority op. at 26 (quoting Davis, 207 So. 3d at 174-75).

Although the jury unanimously recommended a death sentence, we cannot know which aggravating factors the jury found or that the jury found each

aggravating factor unanimously. Because two of the aggravators found by the trial court for the murder in this case—that the capital felony was committed to avoid arrest (as to both victims), and that the murders were committed in a cold, calculated and premeditated manner—require specific factual findings, <u>Hurst</u> requires that the jury, not the trial judge, make that determination. The jury made no such determination in Oliver's case.

By ignoring the record and concluding that all aggravators were unanimously found by the jury, the majority is engaging in the exact type of conduct the United States Supreme Court cautioned against. <u>See</u> <u>Hurst v. Florida</u>, 136 S. Ct. at 622. Because the harmless error review is neither a sufficiency of the evidence review nor "a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence," <u>see</u> <u>DiGuilio</u>, 491 So. 2d at 1139, I cannot conclude beyond a reasonable doubt that the error here was harmless, and I would vacate Oliver's unconstitutional death sentence and remand for resentencing. <u>See</u> <u>Hurst</u>, 202 So. 3d at 69.

An Appeal from the Circuit Court in and for Brevard County,
  Robert A. Wohn, Jr., Judge - Case No. 052009CF043923AXXXXX

James S. Purdy, Public Defender, and O.H. Eaton, Jr., and Nancy Ryan, Assistant Public Defenders, Seventh Judicial Circuit, Daytona Beach, Florida,

  for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Stacey E. Kircher, Assistant Attorney General, Daytona Beach, Florida,

for Appellee

Robert C. Josefsberg of Podhurst Orseck, P.A., Miami, Florida; Robert G. Kerrigan of Kerrigan, Estess, Rankin, McLeod & Thompson, LLP, Pensacola, Florida; Karen M. Gottlieb of Florida Center for Capital Representation, Miami, Florida; and Sonya Rudenstine, Gainesville, Florida,

for Amici Curiae Justice Harry Lee Anstead, Judge Rosemary Barkett, Martha Barnett, Talbot D'Alemberte, Hank Coxe, Justice Gerald Kogan, Florida Association of Criminal Defense Lawyers, Florida Capital Resource Center, and Florida Center for Capital Representation